776 So.2d 376 (2000)
STATE of Louisiana
v.
Phillip ANTHONY.
No. 98-KA-0406.
Supreme Court of Louisiana.
April 11, 2000.
Rehearing Denied May 12, 2000.
*379 Clarence Roby, Paula Mangini Montonye, Robert Jenkins, Clive Adrian Stafford Smith, New Orleans, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Harry F. Connick, District Attorney, Charles Edwin Foster Heuer, New Orleans, Valentin Michael Solino, Harahan, Counsel for Respondent.
CALOGERO, Chief Justice.[*]
On Sunday morning, December 1, 1996, in the French Quarter in New Orleans, four employees of the Louisiana Pizza Kitchen, Cara LoPiccolo, Santana Meaux, Michael Witkoskie, and Damien Vincent, were systematically shot, one by one, in the restaurant's tiny walk-in cooler. The booming report of the gunshots, delivered *380 by a potato-shrouded .357 revolver, reverberated in the cramped cooler. The ensuing silence belied the horrible scene: Cara LoPiccolo, a wife and mother of two, dead, slumped on the lifeless body of Santana Meaux, an elementary school teacher moonlighting as a waiter, across from Michael Witkoskie, a tenor with a love for music and drama, whose nearly dead body rested beside Damien Vincent, the wounded sole survivor. Meanwhile, the restaurant safe was open, with its contents, $2,549.84, save the coins, taken by the perpetrators.
In January 1997, an Orleans Parish grand jury indicted defendant, Phillip Anthony, and three co-defendants, Malcolm Hill, Tracey Marquez, and Sidney Anthony, with three counts of first degree murder in the deaths of Cara LoPiccolo, Santana Meaux, and Michael Witkoskie, committed during the perpetration or attempted perpetration of an armed robbery and/or where the offender had the specific intent to kill more than one person, in violation of La.Rev.Stat. 14:30(A)(1) and (3). Before trial, the State successfully moved to sever the trial of defendants Tracey Marquez and Sidney Anthony from the trial of their co-defendants. Additionally, the trial court granted the motion of co-defendant, Malcolm Hill, which sought a severance of his trial from the trial of defendant, Phillip Anthony.[1]
Defendant was convicted in the Criminal District Court, Parish of Orleans, on three counts of first degree murder. La.Rev. Stat. 14:30. Following the penalty phase of the trial, the jury recommended that a sentence of death be imposed. The Honorable Julian Parker sentenced the defendant to death in accordance with the jury's recommendation. On appeal to this Court, which is automatic under La. Const. art. V, § 5(D)(2), defendant relies on fourteen assignments of error for the reversal of his conviction and sentence. The principal issues are (1) the sufficiency of the evidence concerning whether defendant was the actual triggerman, and whether such a distinction obviates the imposition of the death penalty (assuming defendant was not the triggerman), (2) whether the admission into evidence of the sawed-off shotgun seized from the apartment of Sidney Anthony, the driver, constitutes reversible error, (3) whether probable cause existed (so that subsequently seized evidence was admissible) on the evening of December 1, 1996, when Phillip Anthony and his cohorts were placed under investigation and then arrested at 2408½ Florida Avenue, and (4) whether the trial court judge erred in refusing to dismiss for cause Juror Carubba, a musician in District Attorney Harry Connick's swing band, after the defendant had exhausted all of his peremptory challenges.[2]
For the reasons set forth below, we affirm defendant's conviction for first degree murder and sentence to death.

FACTS
On Sunday morning, December 1, 1996, four employees of the Louisiana Pizza Kitchen, Cara LoPiccolo, Santana Meaux, Michael Witkoskie, and Damien Vincent, arrived at approximately 10:00 a.m. to begin their opening preparations for the restaurant.[3] *381 Shortly thereafter, defendant and two friends, Malcolm Hill and Tracey Marquez, arrived at the restaurant under the pretense of clarifying the work schedule for Malcolm Hill, who had recently become employed as a dishwasher at the Pizza Kitchen.[4]
Mrs. LoPiccolo unwittingly served the men cold drinks as she and Hill discussed the schedules. Damien Vincent was doing his mopping and sweeping duties in the back when he overheard Cara speaking with Hill, who had called in sick the night before and was scheduled to work that day, too.[5] When Damien returned to the front of the restaurant, defendant summoned him over saying, "Let me holler at you for a minute." Damien put down his mop and went over to defendant, who pulled from his pocket a gun with a potato stuck on the end of the barrel. Defendant ordered Damien to the back of the restaurant, and on the way defendant ordered Michael Witkoskie to come as well.
Damien noticed Cara already in the walk-in cooler, shivering near the front door. He tried to grab her shirt and pull her closer to the back of the cooler for safety. Shortly thereafter, Santana Meaux entered the cooler. Defendant then ordered all four employees to get on their knees. Cara began crying, "Please don't kill me." In addition to observing defendant holding a gun with a potato on the barrel, Damien recalled seeing another unidentified perpetrator's hand holding a gun with a potato on the end of it before he lowered his head. He then heard about four or five shots ring out, before being shot in the back of the neck and blacking out. When Damien regained consciousness, the perpetrators were gone. He climbed over the bodies of his co-workers and called 911, informing the operator that the restaurant had been robbed and that four people had been shot in the cooler.[6] While Damien was on the phone fellow employee Terrell Collins arrived and also spoke with the 911 operator.[7] Terrell then went next door to the Tourist Trap Restaurant to summon help, where he saw a co-worker, waitress Jennifer Pleasants, and told her what had happened.
New Orleans Police Department Lt. Chris Pelleteri was the first officer to arrive on the scene at the Louisiana Pizza Kitchen. Viewing the carnage in the cooler, he heard gurgling sounds from victim Michael Witkoskie. With the help of another officer, they pulled Michael from the cooler and began administering CPR until EMS units arrived. Both Michael and Damien were transported to Charity Hospital for treatment. Damien received treatment in the emergency room; Michael expired upon arrival at the hospital. Cara and Santana were pronounced dead at the scene, each of a single gunshot wound to the head.
Detective Joseph Waguespack, the lead homicide investigator on the case, arrived at the crime scene at 11:15 a.m. and observed the bodies of Cara and Santana *382 inside the walk-in cooler. At his direction, other officers secured the crime scene and began preserving, photographing, and collecting evidence. A single copper casing and fragmented particles of potato were retrieved from the cooler.
Det. Waguespack observed the restaurant's office, where he noted the safe was open and the cash register drawers had all the currency removed, but the coins left untouched.
Outside the cooler, the police observed a grease board bearing the cryptic message, "Trip an get flipped like a pancake[;] thinkin this man a Fake[.] Now they bringin flowers to you wake."[8] During the subsequent investigation, Officer James Dupuis, an expert in the field of handwriting analysis, compared the handwriting on the grease board with a handwriting exemplar taken from defendant and found the two to be of common authorship.
Det. Kenneth Harris met with Damien Vincent, shortly after he was transported to Charity Hospital, and learned that three black males were responsible for the crime. Damien described the suspects physically as "big, medium, and small."[9] He described the clothing worn by the largest suspect as a dark blue ski jacket; the middle suspect was wearing a blue, red, and white Atlanta Braves starter jacket; and the smallest suspect was wearing a black Louisiana Pizza Kitchen hat and a camouflage bandana around his neck. Damien Vincent also told Det. Harris that one of the perpetrators was a current employee of the Pizza Kitchen who was scheduled to work Saturday night, but called in sick. Although Damien did not know the employee's name, he told Det. Harris that his name began with the letter "M" and that his name should appear on the bottom of the work schedule located in the restaurant kitchen, because he was the most recent hire at the restaurant.
Armed with this information, the police contacted Rob Gerhart, operations manager for the Louisiana Pizza Kitchen. He provided employee records, including the work schedule for December 1, 1996. Malcolm *383 Hill's name appeared at the bottom of the schedule. Mr. Gerhart also assessed the money missing from the register, based on the previous night's receipts, and determined that $2,549.84 should have been in the safe on the morning of Sunday, December 1, 1996. He further stated that of the employees present only Cara LoPiccolo had the combination to the safe.
The police prepared a six-person photographic lineup containing a photograph of Malcolm Hill. At approximately 5:35 p.m. on December 1, 1996, Det. Waguespack and another detective went to Charity Hospital to see if Damien Vincent could make an identification. After viewing the pictures, Damien turned his head and would not identify anyone at that time.
Following up on the "M" employee, Malcolm Hill, the police learned of possible places where Hill could be found, including his mother's residence and his grandfather's residence. A number of detectives proceeded to those locations, but Hill was not found. Hill's grandfather suggested they try the residence of Hill's girl friend, Valerie Booker, and the police proceeded to her apartment at 2408½ Florida Avenue.[10] At approximately 9:30 p.m. on December 1st, the police found Malcolm Hill in the company of two other black males, defendant and Tracey Marquez. Given that the officers were aware of the distinct height descriptions of the three suspects, and that the males in Hill's company matched the "step ladder" description, all three suspects were transported to the homicide office for questioning.[11] The officers advised the three men that they were under investigation for first degree murder, and then secured the residence until a search warrant was obtained.
Meanwhile, Det. Kenneth Harris returned to Charity Hospital, where Damien Vincent had been moved from the trauma ward to a private room. The officer again presented the photographic lineup and Damien Vincent positively identified Malcolm Hill as the person who had entered the restaurant that morning, whom he had earlier described as the medium built guy and the "M" employee. By police radio, Sgt. Mike Sposito learned that Damien Vincent had positively identified Malcolm Hill, and at that point, Sgt. Sposito advised Hill that he was under arrest for first degree murder.[12]
The officers prepared photographic lineups containing photographs of defendant and Tracey Marquez, and at approximately 11:30 p.m. on December 1st, Det. Kenneth Harris presented separately the two photographic lineups to Damien Vincent. Damien positively identified Phillip Anthony as the big guy in the blue jacket who had the gun with the potato on the end of it. He was unable to identify anyone in the photographic lineup including Tracey Marquez.[13] Subsequently, defendant was *384 placed under arrest for first degree murder.[14]
At approximately 1:30 a.m. on December 2nd, the police executed a search warrant at 2408½ Florida Avenue, the residence of Hill's girl friend, Valerie Booker, and where defendant, Hill, and Marquez were found. There they found two weapons in the living and bedroom areas. In the attic of the apartment, the officers found a red Rubbermaid ice chest, which contained clothing that Damien Vincent had earlier described as being worn by Malcolm Hill (the Atlanta Braves jacket and blue wind-suit pants). Beneath the clothing, the officers found a .22 caliber revolver and a fully loaded .357 magnum revolver and four spent casings. Later, the police firearms examiner identified the .357 magnum revolver as the murder weapon.[15] Additionally, a white substance was noticeable on the end of the .357 magnum revolver, and subsequent analysis by the NOPD Crime Lab revealed that the substance was potato starch.
Regarding the seized evidence, NOPD Crime Lab technician Teresia Lamb conducted forensic and trace evidence analysis on the clothing seized from defendant, Malcolm Hill, and Tracey Marquez at booking and clothing seized pursuant to the search of 2408½ Florida Avenue. She visually identified the off-white particles on both of defendant's shoes as potato particles; Malcolm Hill's left shoe and Tracey Marquez's right shoe also revealed trace evidence of potato particles. Particles retrieved from Cara LoPiccolo's hair, during autopsy, were also tested and identified by Ms. Lamb as potato.
During the investigation, the police interviewed employees and individuals working in the vicinity of the Louisiana Pizza Kitchen who may have noticed anything on the morning of December 1, 1996. Jennifer Pleasants told police that she was scheduled to work at the Pizza Kitchen as a waitress at 11:30 a.m. on December 1st. She arrived in the French Quarter shortly before 10:00 a.m. to have breakfast at the Tourist Trap Restaurant next door. On her way there, she noticed two guys standing in the area where Pizza Kitchen employees usually stand to take a cigarette break. She looked to see if she knew them as fellow employees, but she did not. She was drawn to the two males by the vast disparity in their heights and was able to see the face of the tall subject as she passed. Approximately twenty minutes later, Terrell Collins came into the Tourist Trap and told her about the shooting. She went with Collins back to the Pizza Kitchen and tried to assist Damien Vincent by getting him something to drink before the paramedics arrived.
On December 7th, the police showed Jennifer Pleasants three photographic lineups and she positively identified defendant as the tall subject she had seen outside the restaurant that morning. She was unable to identify anyone else.
Michael Skinkus told police that he arrived at work at the business adjacent to the Pizza Kitchen on December 1st at 10:00 a.m. He stated that as he was locking his bicycle, three males passed him, walking away from the Pizza Kitchen toward Decatur Street. Moments later, he observed the same three subjects walking back toward the Pizza Kitchen. Mr. Skinkus gave the police detailed descriptions of the heights and clothing. On December 2nd, he positively identified Phillip Anthony *385 as the tallest subject he had seen walking with the other two males.
Finally, the police learned that Angelo Collins unwittingly picked up the three suspects after the shootings, as he had just dropped off his brother, Terrell, to go to work at the Pizza Kitchen. Angelo informed the police that he had previously worked at the Pizza Kitchen from 1991-1996 and knew defendant from his brief tenure there. As he was driving down Barracks Street, defendant called to him by his nickname, `Lo, and asked him for a ride to Elysian Fields and Florida Avenue. Although Angelo Collins did not previously know Hill or Marquez, he agreed to drive them. Phillip Anthony sat in the front seat and kept his left hand in his pocket. The other two males sat in the back seat, but Collins could see their faces in the rearview mirror. Collins further described the three men as a "step ladder" in relative heights, and gave clothing descriptions that mirrored that of other witnesses. On December 9th, in a photographic lineup, Angelo Collins positively identified all three passengers he picked up outside the Pizza Kitchen.

DISCUSSION
Defendant has filed fourteen assignments of error, contending that his conviction and sentence should be reversed. We will consider all of the assignments urged by defendant. We have selected four that merit discussion in this published opinion. Sufficiency of the Evidence and Identity of the Shooter (Assignment of Error XII)
In the twelfth assignment of error, Defendant contends that his death sentence violates the Eighth Amendment of the United States Constitution and Article I, § 20 of the Louisiana Constitution because doubt exists concerning the identity of the shooter. Defendant challenges his death sentence by suggesting that Malcolm Hill was actually the triggerman, not he. In support, defendant cites Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), in which the United States Supreme Court found a statute that authorized the death penalty for participation in a robbery in which another person takes a life to be "an excessive penalty for the robber who, as such, does not take human life." Enmund, 458 U.S. at 797, 102 S.Ct. at 3377. Defendant argues that three pieces of evidence demonstrate that Malcolm Hill, not he, was the triggerman. According to the surviving victim, Damien Vincent, immediately before he put his head down, in addition to observing defendant, he saw another hand appear from around the cooler holding a gun with a potato on the barrel. Furthermore, the.357 revolver, the murder weapon, was in Malcolm Hill's control since it was recovered under Hill's clothing in an ice chest in the attic of Hill's girl friend's house. Finally, according to Tracey Marquez, during the robbery Malcolm Hill had the gun with the brown handle, which was the murder weapon, and defendant had the gun with the black handle.[16]
This assignment of error raises the issues of (1) whether there is sufficient evidence in the record to find that defendant was the triggerman, and (2) if *386 the evidence is insufficient to prove that defendant was the triggerman, whether defendant's death sentence violates his constitutional right to be free from cruel, excessive, and unusual punishments. This Court, in order to affirm a conviction, must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to conclude that every element of the crime was proved beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-319, 99 S.Ct. 2781, 2788-2789, 61 L.Ed.2d 560, 573-574 (1979); State v. Captville, 448 So.2d 676, 678 (La.1984).
In this case, the circumstantial evidence was sufficient for a rational trier of fact to conclude that Phillip Anthony was the shooter. Although Damien Vincent testified that he did not actually see defendant pull the trigger, the State presented substantial circumstantial evidence in support of this fact. Defendant stood in the small doorway of the cooler brandishing a gun with a potato on the barrel immediately before the victims were shot. It was he who ordered the victims to their knees. He was the last perpetrator seen by the sole survivor, Damien Vincent, just before the latter closed his eyes, bowed his head, and took his bullet. And, defendant's shoes were the most heavily encrusted with potato particles.[17] Moreover, defendant's contention that Malcolm Hill was the triggerman because the murder weapon was later in Hill's control, as the gun was found under Hill's clothing in Hill's girl friend's attic, is not meritorious in light of defendant's repeated presence at 2408½ Florida Avenue throughout the day on December 1, 1996. This evidence was sufficient for a rational trier of fact to conclude that defendant was the triggerman whose actions warrant the sentence of death.
Furthermore, contrary to defendant's position implying that if he did not pull the trigger, then he cannot be sentenced to death, the State is not required to show that defendant actually pulled the trigger. Instead, to successfully carry its burden, the State must prove that defendant acted in concert with his co-perpetrators, that defendant had the specific intent to kill, and that one of the aggravating elements enumerated in La.Rev.Stat. 14:30 was present. See State v. Brooks, 505 So.2d 714, 717-718 (La.1987); see also State v. Holmes, 388 So.2d 722, 725-726 (La.1980); La.Rev.Stat. 14:24. Under Enmund v. Florida, an aider and abettor may not receive the death penalty for felony murder, if he does not himself kill, attempt to kill, or intend to kill. Enmund, 458 U.S. at 797, 102 S.Ct. at 3376 (emphasis added). However, the United States Supreme Court modified the Enmund decision slightly in Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). In Tison, the Court found that the Eighth Amendment does not prohibit the death penalty in the case of a defendant who participates in a felony, which results in murder, if the defendant's participation is "major" and "the defendant has a mental element of reckless indifference." Tison, 481 U.S. at 158, 107 S.Ct. at 1688. In this case, the evidence supports the finding that defendant was the triggerman. But even if he was not the triggerman, defendant gets no solace from Enmund because, at the very least, his participation was major and he had, minimally, a mental element of reckless indifference. Tison v. Arizona, 481 U.S. at 158, 107 S.Ct. at 1688. In fact, even without establishing that defendant was the triggerman, his conviction is valid because he was involved in this felony-murder and he intended, from the outset, to kill these victims.
In this case, the State established that defendant had the specific intent to kill the victims. First, Damien Vincent described defendant's gun as having a potato on the *387 barrel functioning as a crude silencer. In addition, "the big guy" ordered all of the victims to their knees, and the last person Damien saw in the cooler before the shots rang out was "the big guy." Furthermore, defendant robbed a business where he was formerly employed. Defendant knew that he would be recognized by some of the employees, and to prevent being identified would have to kill the employees that were present. Finally, defendant's hand left the cryptic message on the restaurant's grease board. Taken as a whole, the State's circumstantial case against defendant strongly supports a finding of specific intent to kill. Accordingly, this assignment lacks merit.

Admission of the Guns into Evidence (Assignment of Error I)
In his first assignment of error, defendant contends that he was denied the rights guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution because his convictions and death sentences were not the result of "an adjudication of his individualized culpability." Specifically, defendant complains that although his case was severed from those of his co-defendants, the State, nevertheless, introduced evidence, especially guns, that was relevant only to the other defendants. In this regard, counsel argues the trial court abandoned its "function as a gatekeeper" with respect to admitting such evidence.
Defendant argues that the trial court judge admitted evidence that was irrelevant and prejudicial. In defendant's view, the evidence, which "belonged" to his co-defendants and related to their guilt or innocence, had no relevance to him. Defendant's chief complaint relates to the admission of the guns seized pursuant to valid search warrants at 2408½ Florida Avenue on December 1, 1996, and at Sidney Anthony's bedroom and locker on December 5th and December 11th, respectively.[18] Defendant asserts that the State improperly introduced the gun evidence to imply that he had ready access to an "arsenal" of weapons. Further, defendant suggests that the guns injected prohibited "bad character" evidence in his guilt phase.
La.Code Evid. art. 401 defines relevant evidence as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Further, all relevant evidence is admissible unless constitutionally prohibited. La. Code Evid. art. 402. Finally, relevant evidence may be excluded if its probative value is outweighed by "the danger of unfair prejudice." La.Code Evid. art. 403. The trial court is given great discretion in determining whether evidence is relevant, and absent a clear abuse of discretion, rulings on relevancy of evidence should not be disturbed on appeal. State v. Stowe, 93-2020 (La.4/11/94), 635 So.2d 168, 173; State v. Mayeaux, 570 So.2d 185, 189-90 (La.App. 5th Cir.1990), writ denied, 575 So.2d 386 (La.1991).
According to the record, five guns were admitted into evidence: (1) the Smith and Wesson .357 magnum revolver, which was seized from Valerie Booker's residence on *388 the evening of December 1st and subsequently identified as the murder weapon (Exhibit S-105); (2) the CDM .22 caliber revolver, which was seized from Booker's residence (Exhibit S-102); (3) the Charter Arms .38 caliber revolver, which was seized from Booker's residence (Exhibit S-103); (4) the Smith and Wesson .38 caliber revolver, which was seized from Booker's residence (Exhibit S-106); and (5) the Springfield .410 gauge sawed-off shotgun, which was seized from Sidney Anthony's, the driver's, residence (Exhibit S-133).
The only gun that is arguably irrelevant is the sawed-off shotgun, retrieved from Sidney Anthony's bedroom. The other four guns were found just hours after the murders at 2408½ Florida Avenue, the residence where defendant, Malcolm Hill, and Tracey Marquez were all arrested. In addition, defendant and his co-defendant's shared constructive possession of those four guns when the police arrived at 2408½ Florida Avenue, on the night of December 1, 1996. Moreover, defendant's argument that Valerie Booker's residence is more closely linked to Malcolm Hill and Tracey Marquez than to him is defeated by his repeated presence at that residence throughout the day of December 1, 1996.
Forensic testing revealed that the .357 Smith and Wesson revolver (Exhibit S-105), which was found in the ice chest, was the murder weapon used to shoot the four victims. Clearly, the .357 caliber revolver was properly admitted under La.Code Evid. art. 401. Additionally, the .22 caliber revolver, also recovered in the ice chest, is relevant by virtue of its proximity to the murder weapon. The other two weapons seized from 2408½ Florida Avenue are similarly relevant because of the high probability that more than one of the perpetrators who entered the Pizza Kitchen was armed. In fact, any of the other four weapons found at 2408½ Florida Avenue could have been carried by Malcolm Hill or Tracey Marquez earlier in the day. No errors of admission, on relevance grounds, can be perceived as to the evidence seized from 2408½ Florida Avenue. La.Code Evid. art. 401.
Turning to the evidence seized from 709 N. Claiborne Avenue, the residence of Sidney Anthony, the relevance is more tenuous.[19] Notwithstanding the absence of testimony establishing that any of the victims were killed by a .410 gauge sawed-off shotgun, the judge concluded the hearings on the motion to suppress evidence by allowing the gun to be admitted, apparently on grounds of intent. Accordingly, Det. Waguespack testified at trial that during his investigation he executed a search warrant at the residence of Sidney Anthony and seized a sawed-off shotgun along with a variety of ammunition in varying calibers.
As a general matter, before demonstrative evidence can be admitted into evidence it must be shown that, more probably than not, the evidence is connected to the case. That foundation can be laid by establishing a chain of custody of the evidence or by visual identification. Once that foundation is established, the weight to be given the evidence is a question for the jury. State v. Manieri, 378 So.2d 931 (La.1979); See also State v. Landry, 388 So.2d 699, 704 (La.1980).
In Manieri, the State sought to introduce several knives, none of them the actual murder weapon. This Court held:
It is error to introduce into evidence weapons which are allegedly "similar" to the ones used in the murder. The jurors naturally tend to infer a connection between the weapon and the murder simply from a mere viewing of the material object, although such a connection is not proved. The viewing tends without *389 proof prejudicially to associate the accused with the deadly weapon. Because the potential for prejudicial effect may outweigh any probative value such evidence may possess, it is our view that a trial judge flirts with prejudicial error when he permits such evidence to be introduced.
Manieri, 378 So.2d at 933.
Nevertheless, the Manieri Court deemed the error harmless because no effort was made to connect the weapons with the accused or the crime. Manieri, 378 So.2d at 933.
Likewise, in the instant case, the trial judge erred by admitting the sawed-off shotgun. The weapon fails the "more probable than not" test for connexity with the triple homicide at Louisiana Pizza Kitchen, as it bears little relevance to this case. As in Manieri, testimony clearly established that the weapon was seized from the residence of Sidney Anthony, rather than defendant's, and no connection between defendant and the sawed-off shotgun was made. Nonetheless, the State did not exploit the evidence by referring to it in any other testimony or in argument. Accordingly, although the judge erroneously admitted the sawed-off shotgun, the error is not reversible in light of the eyewitness testimony of Damien Vincent naming defendant as the killer and additionally the overwhelmingly damning circumstantial evidence against defendant. Accordingly, this assignment is without merit.

Motions to Suppress the Identification and the Evidence (Assignment of Error II)
In his second assignment of error, defendant asserts that the trial court erred by denying his motions to suppress evidence and identification because both were tainted "fruits" of his illegal arrest, which defendant claims was not supported by probable cause. In defendant's view, at approximately 9:30 p.m. on December 1, 1996, he was removed from the residence at 2408½ Florida Avenue, ordered to lie on the sidewalk, handcuffed, searched, placed in the back of a police car, transported to the police station, and interrogated for approximately four hours, before being formally arrested. Defendant urges that he was under arrest at 9:30 p.m. and that the warrantless arrest was without probable cause. Consequently, defendant contends that the rubber glove seized from his right, back pocket, his shoes, and the alleged photograph taken by the police, which was subsequently used in the photographic line ups, should be suppressed.
A custodial arrest must be supported by probable cause, Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and as to any evidence seized pursuant to that arrest, the State bears the burden of establishing its admissibility. Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). A warrantless arrest in a public place is not "illegal" if based on probable cause. United States v. Watson, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). Generally, probable cause for a warrantless arrest exists when facts and circumstances known to an arresting officer are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); State v. Scales, 93-2003, p. 6 (La.5/22/95), 655 So.2d 1326, 1331; State v. Marks, 337 So.2d 1177, 1181 (La.1976); La.Code Crim. Proc. art. 213. Moreover, a warrantless search of a person and the immediate area within such person's control is justified following a lawful arrest. See Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); State v. Wilson, 467 So.2d 503, 515-18 (La.1985).
This Court has made clear that "the determination of reasonable grounds for an investigatory stop, or probable cause for an arrest, does not rest on the officer's subjective beliefs or attitudes but turns on a completely objective evaluation of all of [the] circumstances known to *390 the officer at the time of his challenged action." State v. Kalie, 96-2650, p. 1 (La.9/19/97), 699 So.2d 879, 880 (emphasis in original) (citing Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) and State v. Wilkens, 364 So.2d 934, 937 (La.1978)). Therefore, Sgt. Sposito's testimony stating his opinion that defendant and Tracey Marquez were transported to the Homicide Office for "investigative purposes" does not preclude this Court from inquiring into the probable cause basis for the officers' actions.
The circumstances known at the time the officers confronted defendant in the evening of Sunday, December 1st, demonstrate that probable cause existed to arrest defendant. The officers who went to 2408½ Florida Avenue in search of Malcolm Hill had specific descriptions of three black males whose relative heights resembled a "step ladder." After arriving at the hospital, victim Damien Vincent gave the officers height, weight, and clothing descriptions of the three perpetrators. In the early afternoon of December 1, 1996, witness Michael Skinkus gave the investigating officers a detailed physical and clothing description of the three males who had walked by him twice, earlier that morning. Additionally, Jennifer Pleasants gave similar information regarding defendant and Tracey Marquez, whom she spotted standing in the employee's smoking area outside the Pizza Kitchen just before the shootings. The officers' probable cause to detain defendant and Tracey Marquez was no doubt fortified by the fact that three males matching the exact height, weight, and clothing descriptions as the suspects were found together, hours after the shootings, at 2408½ Florida Avenue and that one of those individuals, Malcolm Hill, was suspected as being the person whom Damien Vincent had seen speaking with Cara LoPiccolo just before the shooting and whom he knew as the most recent employee hired at the Pizza Kitchen with the first initial "M." The officers' assessment that defendant and Marquez "fit the description" provided grounds for placing them under de facto arrest. Regardless of how defendant, and the testifying officers, categorized the detention, the officers were armed with sufficient probable cause to arrest defendant. Accordingly, all evidence seized from his person upon being taken into custody, i.e., the rubber glove, and the clothing and boots he had on, was properly admitted.
Defendant further complains that, while at the Homicide Office for "further investigation," the police procured a photograph of him, which they used in a photographic array displayed to Damien Vincent approximately two hours later.[20] Defendant claims that this photograph was part of the "tainted fruits" of the illegal arrest and the identification from that picture should have been suppressed. For the same reasons as the physical evidence discussed above, the officers had probable cause to make a de facto arrest when they encountered defendant in the company of Malcolm Hill at 2408½ Florida Avenue. La.Code Crim. Proc. art. 213; Wilkens, 364 So.2d at 937. Furthermore, police officers have the authority (and the obligation) to photograph an individual who has been arrested. See La.Rev.Stat. 15:591.[21] In sum, defendant's *391 arrest on charges of triple homicide is supported by probable cause. Thus, the subsequent identification of him was not tainted. No Fourth Amendment violation is perceived; consequently, the exclusionary rule does not apply. Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Denial of Defense's Challenge for Cause (Assignment of Error V)
In his fifth assignment of error, defendant alleges numerous errors during voir dire. Specifically, defendant contends that it was error for the trial court to deny the defense challenges for cause regarding prospective juror Carubba.
Prejudice is presumed by a trial judge when a challenge for cause is erroneously denied and the defendant has exhausted his peremptory challenges. State v. Robertson, 92-2660, p. 3 (La.1/14/94), 630 So.2d 1278, 1280; State v. Ross, 623 So.2d 643, 644 (La.1993). An erroneous ruling depriving an accused of a peremptory challenge is a substantial violation and constitutes reversible error. State v. Cross, 93-1189, p. 6 (La.6/30/95), 658 So.2d 683, 686; State v. Bourque, 622 So.2d 198, 225 (La.1993). A trial court is vested with broad discretion in ruling on challenges for cause, and these rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. Cross, 93-1189, pp. 6-7, 658 So.2d at 686-87; Robertson, 630 So.2d at 1281. A trial judge's refusal to excuse a prospective juror for cause is not an abuse of discretion, notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, when, on further inquiry or instruction, the juror "has demonstrated a willingness and ability to decide the case impartially according to the law and evidence." State v. Claiborne, 397 So.2d 486, 489 (La.1981). Furthermore, the proper standard for determining whether a prospective juror should be excluded for cause is whether his views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985).
In the instant case, defendant exhausted his peremptory challenges, and therefore, need only show that the trial court abused its discretion by denying his challenge for cause. State v. Cross, 93-1189, p. 6, 658 So.2d at 686; Ross, 623 So.2d at 644.
Defendant points to Mr. Carubba, whom the defense challenged for cause, claiming four areas of juror bias: 1) his employment relationship in District Attorney Harry Connick's swing band; 2) his "gig" schedule with that band; 3) his family's victimization; and 4) his having taught the trial judge, Judge Parker, in college.
La.Code Crim. Proc. art. 797 states, in pertinent part, that the State or the defendant may challenge a juror for cause on the ground that:
* * *
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude *392 that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court;

* * *
This Court has held that the mere relationship between a prospective juror and the district attorney does not ipso facto disqualify him from service. State v. Jones, 345 So.2d 1157, 1160-61 (La.1977). The defendant may only challenge the juror if his relationship is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict. La.Code Crim. Proc. art. 797; State v. Mills, 505 So.2d 933, 945 (La.App. 2d Cir.), writ denied, 508 So.2d 65 (La. 1987). The facts must reasonably lead to the conclusion that the relationship would influence the juror in arriving at a verdict. Mills, 505 So.2d at 945. A challenge for cause should be granted, even if the juror declares an ability to remain impartial, when the juror's responses reveal facts from which bias, prejudice, or impartiality may be reasonably inferred. State v. Albert, 414 So.2d 680, 682 (La.1982). A charge of juror bias may be removed if the prospective juror is rehabilitated, that is, if the court is satisfied that the juror can render an impartial verdict according to the evidence and instructions given by the court. State v. Gibson, 505 So.2d 237, 240 (La.App. 3rd Cir.), writ denied, 508 So.2d 66 (La.1987). A trial judge is afforded broad discretion and his ruling should not be disturbed absent an abuse of discretion. State v. Monroe, 366 So.2d 1345, 1347 (La. 1978).
In the instant case, Mr. Carubba acknowledged that he performed with Mr. Connick's musical group, scheduled generally on Tuesday, Wednesday, and Thursday of most weeks. Nevertheless, he maintained the relationship would not cause him to side with the District Attorney's office in this case. Mr. Carubba also stated that his parents had been robbed, tied up, and pistol whipped seven years before. He also revealed that two cars had been stolen from the front of his house. Mr. Carubba stated that these facts would not prevent him from being fair and impartial. He also said that he would be able to get a substitute musician while he served as a juror. Finally, Mr. Carubba affirmed that he could consider both life imprisonment and the death penalty, that he had not formed an opinion in the case, and that he would not deny the defendant his presumption of innocence.
Under these facts, the trial court's determination regarding Mr. Carubba's competency to serve as a juror was not an abuse of discretion. The trial judge is accorded broad discretion in ruling on cause challenges because he "has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questioning by the parties' attorneys." State v. Lee, 93-2810, p. 9 (La.5/23/94), 637 So.2d 102, 108. Mr. Carubba had three potentially disqualifying sources of partiality in his background which, in combination, if not individually, arguably made him unsuited to serve as an impartial juror. Notwithstanding, Mr. Carubba gave the appropriate responses when asked how the various elements in his background would affect his performance on the jury. Particularly with regard to his relationship with D.A. Connick, Mr. Carubba indicated that he was a retired college professor who, nevertheless, continued his other profession/avocation "as a professional musician." Given these circumstances, the content of Mr. Carubba's answers, and taking into account the demeanor of the prospective juror, the trial court had a basis for concluding that Mr. Carubba was not so dependent on continued employment in the band that he would not exercise the requisite autonomy in judging the evidence presented at trial. Accordingly, the trial court judge's ruling was not an abuse of discretion.
For the reasons previously given, we conclude that none of defendant's assignments *393 of error are meritorious and are, therefore, insufficient to overturn his conviction for the commission of three first degree murders.

Capital Sentence Review
Under La.Code Crim. Proc. art. 905.9 and La. S.Ct. R. 28, this Court reviews every sentence of death imposed by Louisiana courts to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under the influence of passion, prejudice, or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
The district judge has filed the Uniform Capital Sentence Report required by La. S.Ct. R. 28, § 3(a) and the Department of Public Safety and Correction submitted a Capital Sentence Investigation Report. See La. S.Ct. R. 28, § 3(b). In addition, the State filed a Capital Sentence Review Memorandum, complete with an appendix of all capital cases prosecuted in Orleans Parish since 1976.
These documents indicate that defendant is a black male born on September 9, 1973, in New Orleans. He is the eldest of three children born of the legal union of Jacqueline and Phillip Anthony, Sr. Defendant was twenty-three years old at the time of the instant offense. He was raised in the ninth ward in New Orleans at 638 Piety Street. His father was employed as an elevator technician and his mother was a school teacher for the Orleans Parish Public School System. Defendant claimed no unusual problems in his childhood. Defendant described his father as an alcoholic, who died of a heart attack when defendant was twenty-two years old. Defendant's parents separated one year before his father's death, although defendant was unaware of any serious marital problems between his parents.
At age nineteen, defendant moved in with his girl friend, Torrie Abram, at 911 Frenchman Street, and they lived together for five years, until the time of defendant's arrest on the instant offenses. At the time of his arrest, defendant was single, although he claims that he and Torrie planned to marry. Defendant has no children.
Defendant completed the eleventh grade at Francis T. Nicholls High School and received his GED at McDonough # 16 in 1994. He also received vocational training at The Refrigeration School of New Orleans in 1993. Furthermore, defendant's employment history is sporadic, as evidenced by the six minor jobs he held, none in excess of six months, between 1992 and 1996, which included the positions of dishwasher, laborer, sandwich artist, laundry worker, and hod carrier.
Although defendant's sanity was not an issue in the case, a pretrial psychological evaluation of defendant was performed by Mark Zimmerman, Ph.D., who informed defense counsel and the trial court that he detected no psychological deficiencies and/or abnormalities. Defendant reported to the probation officer conducting the presentence investigation report that he was treated for a suicide attempt in June or July, 1994, brought on by depression. Defendant felt that he was failing everything he tried to accomplish and could not get a job in his field of air conditioning and refrigeration. He reported that he began drinking heavily at age seventeen, but stopped on September 19, 1996, as a promise to his brother. He reported that he occasionally (monthly) smoked marijuana and snorted cocaine once when he was sixteen years old. There is no indication that defendant was under the influence of alcohol or any controlled dangerous substances at the time of these murders.
As to each of the three counts of first degree murder, the State presented three aggravating circumstances, under La.Code Crim. Proc. art. 905.4(A), and the jury returned death verdicts, agreeing that *394 all three were supported by the evidence: (1) the offender was engaged in the perpetration of an armed robbery; (4) the offender knowingly created a risk of death or great bodily harm to more than one person; and (7) the offense was committed in an especially heinous, atrocious or cruel manner.
At the penalty phase, the State presented brief victim-impact testimony from the following: Jean Rogers, Cara LoPiccolo's mother; Albert Witkoskie, Michael Witkoskie's father; Nancy Ott, Santana Meaux's mother; and Richard LoPicollo, Cara's husband. During the testimony of Richard LoPiccolo, the State introduced a brief videotape depicting portions of Cara's life.
Defendant did not testify at either phase of his capital trial. The defense presented seven witnesses at the penalty phase, including a prison expert, a spiritual advisor, and defendant's aunts, sister, brother, and mother. In mitigation, the defense argued that defendant had no significant criminal history; that the offense was committed while defendant was under the influence or domination of another; the youth of the offender; and defendant was a principal whose participation was relatively minor. La.Code Crim. Proc. art. 905.5(a),(c),(f), and (g). Arguably, defendant had no significant criminal history (certainly, there were no adjudicated or unadjudicated felonies, although he had a lengthy arrest record). Furthermore, there is no evidence in the record demonstrating that defendant was under the influence of drugs or alcohol at the time of the offense, nor under the influence, control, or dominion of another, nor that his participation was "relatively minor."
Race does not appear to have injected itself into these proceedings. Although all three murder victims were white, the victim of attempted first degree murder, the victim who miraculously survived, is black, as is defendant and his three co-perpetrators. Several of the State's witnesses were black, as were both defense attorneys and the judge.
Defendant further claims that errors committed in the guilt phase of his capital trial injected prejudice in the penalty phase, namely, the erroneously admitted evidence. However, these arguments were fully addressed above, and found to lack merit. See infra pp. 387-389. Consequently, no prejudice is perceived.
Turning to aggravating circumstances, defendant was indicted by grand jury and charged with committing three counts of first degree murder while engaged in the perpetration or attempted perpetration of an armed robbery, and/or where the offender intended to kill more than one person. During pre-trial, the State filed its "Notice of Intent to Rely on Aggravating Circumstances" listing the following aggravating circumstances to be relied upon at the sentencing hearing: 1) defendant was engaged in the perpetration or attempted perpetration of an armed robbery, La. Code Crim. Proc. art. 905.4(A)(1); 2) defendant knowingly created a risk of death or great bodily harm to more than one person, La.Code Crim. Proc. art. 905.4(A)(4); and 3) the offense was committed in an especially heinous, atrocious or cruel manner. La.Code Crim. Proc. art. 905.4(A)(7). The jury returned its death verdict on all three counts of first degree murder after finding that the evidence supported all three aggravating circumstances urged by the State.
We conclude that the jury's finding beyond a reasonable doubt of the aggravating circumstance, "the offender knowingly created a risk of death or great bodily harm to more than one person," was adequately supported by the evidence in the instant case. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Defendant chose to rob a business where he knew or should have known that he would be recognized, having worked recently at the Pizza Kitchen, thereby sealing the fate of anyone in the restaurant in the morning on December 1st. Defendant, while possessing a revolver with a *395 potato on the barrel, herded the Pizza Kitchen employees into the walk-in cooler and ordered the victims to their knees. Finally, defendant said, "Come on, come on," in response to Cara LoPiccolo's cry for mercy. Consequently, it was reasonable for the jury to find that the defendant contemplated and caused the death of the three victims and great bodily harm to one victim.
Furthermore, the State presented sufficient evidence to demonstrate that the instant murders were committed in the course of an armed robbery in which the victims were corralled into the restaurant cooler, ordered to their knees, and executed after defendant and his cohorts took the contents, except the coins, of the restaurant's safe. La.Rev.Stat. 14:64; see Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
The third aggravating circumstance found by the jury, "the offense was committed in an especially heinous, atrocious or cruel manner," is problematic. However, it is well-settled that the failure of one aggravating circumstance does not require setting aside a capital sentence resting upon other properly found aggravating circumstances unless the evidence introduced to support the failed circumstance interjected an arbitrary factor into the proceedings. State v. Connolly, 96-1680, pp. 17-18 (La.7/1/97), 700 So.2d 810, 822; State v. Welcome, 458 So.2d 1235, 1245 (La.1983). Even accepting defendant's claim that no evidence of torture or "pitiless infliction of unnecessary pain and suffering" accompanied each victim's single gunshot wound to the head, the inclusion of evidence of this aggravating circumstance did not interject an arbitrary factor into these proceedings because evidence of the manner in which the offense was committed and of the nature of the victim's injuries was relevant and properly admitted at trial. See State v. Roy, 95-0638, p. 19-20 (La.10/4/96), 681 So.2d 1230, 1242. In this case, the evidence presented by the State during the guilt stage had already fully informed the jury of the circumstances surrounding the victims' deaths. Thus, reintroduction of that evidence at the penalty phase did not interject an arbitrary factor into the proceeding. See La.Code Crim. Proc. art. 905.2(A) ("The jury may consider [at sentencing] any evidence offered at the trial on the issue of guilt.").

Proportionality Review
Although the federal Constitution does not require proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990). This Court, however, has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, inter alia, a sufficiently "large number of persuasive mitigating factors." State v. Sonnier, 380 So.2d 1, 9 (La.1979).
This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, 380 So.2d at 7-8.
The State's Sentence Review Memorandum reveals that since 1976, three hundred and seventy-six cases have originated as first degree murder charges in Orleans Parish, including defendant's case, and of those, juries have recommended the imposition of death thirty-seven times, including the instant case. Of those thirty-seven cases in which the juries recommended death, twenty-four, including the defendant's, have involved homicides committed during the commission of an armed robbery.
*396 This offense was committed during the commission of an armed robbery or an attempted armed robbery. Thus, whether a search is limited to Orleans Parish or conducted on a statewide basis, this Court has consistently affirmed capital sentences for murders committed during armed robberies. See, e.g., State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012 (Caddo Parish); State v. Busby, 464 So.2d 262 (La. 1985), sentence vacated, 538 So.2d 164 (La.1988)(Vernon Parish); State v. Knighton, 436 So.2d 1141 (La.1983) (Bossier Parish); State v. Taylor, 422 So.2d 109 (La. 1982) (Jefferson Parish); State v. Lindsey, 543 So.2d 886 (La.1989) (Jefferson Parish).
One of these cases mirrors the facts of the instant case, in which restaurant employees were corralled into the cooler and executed. Like the instant case, the State relied on aggravating circumstances of "during an armed robbery" and "more than one victim." La.Code Crim. Proc. art. 905.4(1) and (4). In State v. Tyler, 97-0338 (La.9/9/98), 723 So.2d 939, a Caddo Parish jury determined that defendant should be sentenced to death after he entered a Pizza Hut armed with a .22 caliber revolver, ordered the three employees to lie face down on the floor in the cooler after robbing them, and then shot each one in the back of the head. One employee was killed, and two employees survived without permanent physical injury.
A comparison of defendant's case with the above-referenced cases, indicates that the death penalty as applied to Phillip Anthony is not disproportionate considering the offender and the offenses.

DECREE
For the reasons assigned herein, defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) the Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules for rehearing of denial of certiorari, or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under La.Code Crim. Proc. art. 923 of finality on direct appeal, and before signing the warrant of execution, as provided by La. Rev.Stat. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La.Rev.Stat. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
NOTES
[*] Kimball, J., not on panel. See Rule IV, Part 2, § 3.
[1] On November 3, 1997, defendant Malcolm Hill pled guilty to three counts of first degree murder and the trial court sentenced him to three consecutive life sentences, each to be served without benefit of parole, probation, or suspension of sentence.

Subsequently, Tracey Marquez pled guilty to attempted first degree murder, armed robbery, and manslaughter, and was sentenced to 50 years imprisonment at hard labor.
For his role of delivering the other three perpetrators to the Louisiana Pizza Kitchen, Sidney Anthony pled guilty to charges of attempted murder and armed robbery and received a fifteen year sentence.
[2] Assignments of error involving settled principles of law are treated in an unpublished appendix, which is attached to this opinion and is part of the official record in this case.
[3] Cara LoPiccolo was a restaurant manager. Michael Witkoskie and Santana Meaux were waiters, and Damien Vincent was a dishwasher.
[4] Defendant had worked at the Pizza Kitchen as a dishwasher from March 30, 1995, to June 6, 1995. Defendant was discharged after his fourth violation of excessive tardiness.
[5] Damien Vincent and Malcolm Hill had never worked together, but Damien recognized him as the most recent hire at the Pizza Kitchen.
[6] The 911 tape was preserved by the New Orleans Police Department and played for the jury. On it, Damien Vincent described the suspects as three black males. He also stated that the manager would know one of them.
[7] Terrell Collins testified that he was employed in the Pizza Kitchen pantry as a salad maker. Collins was scheduled to arrive for work at 10:00 a.m., but had been dropped off by his brother, Angelo Collins, at the corner of Decatur and Barracks so that he could purchase some donuts at a corner grocery before coming to work. He estimated that he arrived at the Pizza Kitchen around 10:30 a.m.
[8] Det. Waguespack admitted that the police did not seize the grease board until December 7, 1996; however, the restaurant had not been open for business since the shootings on December 1st. In addition, Chiquita Coleman, whose position at the restaurant was prep cook, testified that the purpose of the grease board was for her to communicate various food items she needed to the kitchen manager. She also stated that on the Saturday night before the murders, no cryptic message was written on the board as was found afterwards on Sunday morning.
[9] At trial, Damien Vincent reiterated the descriptions he had given Det. Harris:

This big guy was about six-four, about two-forty, about two-fifty, something like that, brown skin. The middle sized guy was dark skin, about five-nine, something like that, about one-sixty, something like that. And the small guy was like five-six, something like that, about one-thirty, brown skin, too.
Three other eyewitnesses corroborated the profound size differential among defendant, Malcolm Hill, and Tracey Marquez. First, Michael Skinkus, who worked at a boutique adjacent to the Pizza Kitchen and saw the three perpetrators twice while he was securing his bicycle, testified as follows: "The tallest of the three, I believe, was over six-two, maybe over six-five, very tall....The smallest of the three was probably about five-five, and then the middle one was just about exactly between them[,] which would put him about five-eight, five-nine."
Second, Jennifer Pleasants, a Pizza Kitchen waitress who saw defendant and Tracey Marquez outside of the restaurant in an area commonly occupied by Pizza Kitchen employees during breaks, was struck by the size difference between the two. Pleasants testified that "They were considerablyone was very tall and one was very short." Pleasants added that the tall man "was about six-two or six-three."
Third, Angelo Collins, who drove the perpetrators away from the restaurant, remarked at trial that defendant's, Malcolm Hill's, and Tracey Marquez's sizes resembled a "step ladder."
One final note, at trial, the State called Catherine Arnold, the Orleans Criminal Sheriff's Office nurse, to testify regarding defendant's actual height and weight. She testified that when defendant was brought to Central Lockup he measured six feet, one inch, and weighed two hundred, seventy pounds.
[10] Valerie Booker is also the aunt of Tracey Marquez.
[11] During a safety patdown of defendant, Sgt. Mike Sposito located a rubber glove in the right rear pocket of defendant's pants. Defendant told the officer that he liked to chew on rubber gloves and rubber bands.

In addition, Officer Michael Walsh observed Tracey Marquez trying to remove something from his left pants pocket. The officer seized five .38 caliber cartridges and $70 in currency. Det. Ronald Puigh testified that at this point Marquez stated, "I collect bullets, but I don't have a gun."
[12] Sgt. Sposito testified that when he informed Malcolm Hill that he had been positively identified by the living victim, Hill started beating his head against the head rest of the police vehicle.
[13] Upon his arrival at the homicide office, Tracey Marquez, a juvenile, was accompanied by his mother and advised of his rights per Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He made an inculpatory statement detailing his principal participation in the crime as "look out," although the statement was never published to the jury, and Marquez did not testify against defendant. However, through this statement, the police learned that the suspects arrived at the Louisiana Pizza Kitchen in a 1980 off-white Datsun. The police subsequently learned that Sidney Anthony owned such a car.
[14] Det. Joseph Waguespack testified that he seized the clothing and boots defendant was wearing when he was arrested, and ordered the evidence tested by NOPD Crime Lab.
[15] Officer Byron Winbush testified in the field of firearms examination. He examined a copper jacket fragment found inside the cooler of the Pizza Kitchen, as well as bullets retrieved from the autopsies of Cara LoPiccolo and Santana Meaux. His testing revealed that these three bullets were fired from the .357 Smith and Wesson retrieved from the bottom of the Rubbermaid ice chest at 2408½ Florida Avenue. The lead fragment recovered during the autopsy of Michael Witkoskie was too damaged to make a comparison.
[16] In his statement, which was not introduced at trial and does not formally constitute part of the record on appeal, Tracey Marquez described the gun that defendant used as a.38 caliber blue steel with a brown engraved handle. He also stated that the gun was "kinda heavy" and had a potato on the end of it. In fact, the gun was a blue steel .357 Magnum, which Det. Waguespack described as evidencing a white substance on the end of the four-inch barrel. According to Det. Waguespack, this gun was found underneath clothing described as having been worn by Malcolm Hill, in the ice chest found in the attic of 2408½ Florida Avenue. Conversely, Marquez stated that Malcolm Hill carried a.38 that had a dull chrome finish and a black rubber grip. Hill's gun had a much shorter barrel. Det. Waguespack testified that he located a gun fitting this description, a .38 revolver with two-inch barrel, under the mattress in the front room of 2408½ Florida Avenue. Importantly, Marquez stated that defendant's gun had the longer barrel and Malcolm Hill's gun had the shorter barrel.
[17] The evidence at trial revealed potato particles spattered on defendant's clothing and the tops of both of his shoes, whereas, his cohorts had potato particles only on the sides of one shoe each.
[18] In the instant case, as part of their investigation, NOPD detectives seized the guns introduced at trial while executing search warrants at the following locations:

1) 2408½ Florida Avenueresidence of Valerie Booker, Malcolm Hill's girl friend, who is also the aunt of Tracey Marquez. The police seized, inter alia, one CDM, .22 caliber revolver; one .38 caliber Charter Arms revolver; one .38 caliber Smith and Wesson revolver; one .357 caliber Smith and Wesson revolver; and a variety of ammunition.
2) 709 N. Claiborne Avenueresidence of Sidney Anthony. The police seized one .410 gauge Springfield (sawed-off) shotgun, a variety of ammunition, an equalizer, and a cleaning kit for guns.
3) 2601 Alvar StreetHousing Authority of New Orleans (HANO) Officeplace of employment of Sidney Anthony, employee's locker. The police seized one Daewoo .40 caliber pistol and a variety of ammunition.
[19] The only tangential connection that could be inferred, but which was never underscored by the State, was that defendant's cousin Sidney Anthony procured weapons for defendant from time to time. For example, the murder weapon was purchased by Sidney from his co-worker at HANO, Henry Bradford, a mere six weeks before the murder.
[20] While defendant's brief states that the photograph of defendant included in the photographic array presented to Damien Vincent was taken on December 1, 1996, the State's response counters, with absolutely no support, that "[i]t is clear that the police officer's (sic) prepared photographic array, utilizing a previously obtained photograph of Anthony." The State points to no specific date of previous arrest, and the absence of any prior convictions is of no help to the State on this note. Further, the record is silent on the date of defendant's photograph, and further complicating the determination is that all of the photographic lineups entered into evidence in the instant trial are missing. In any event, whether the photograph used in the lineup was taken December 1, 1996, or on some previous occasion is a moot point, because, for the reasons set forth above, defendant's December 1, 1996 arrest is supported by probable cause.
[21] La.Rev.Stat. 15:591 imposes on every criminal justice agency the duty to "collect and submit the name, fingerprints, descriptive photographs and other identifying data on persons lawfully arrested ..." to the Louisiana Bureau of Criminal Identification and Information.