MAX N. TOBIAS, JR., Judge.
I,On 4 August 2010, the state charged the defendant, Scott G. Cleveland (“Cleveland”) by bill of information with one count of simple rape, a violation of La. R.S. 14:43. He entered a plea of not guilty at his arraignment on 12 August 2010. Defense counsel filed motions to suppress identification and for a preliminary hearing. On 21 January 2011, the trial court denied the motions and found probable cause. On 20 July 2011, a six-member jury found Cleveland guilty as charged. See La.C.Cr.P. art. 782. On 5 August 2011, Cleveland filed a motion for post-verdict judgment of acquittal and a motion for new trial, both of which were denied. That same day, the trial court sentenced him to fifteen years at hard labor with credit for time served. Cleveland filed motions for appeal and to reconsider sen *581 tence; the former was granted and the latter denied.
S.H., the victim,[1] related that on 23 May 2010, she and friends, Antineeka Williams, Shintia Taylor, and others, went to the Bridge Lounge in New Orleans between 5:00 and 6:00 p.m. after attending a craw-fish boil earlier in the day. While at the lounge, she met more friends with whom she socialized and drank until approximately 9:00 p.m. One of the victim’s acquaintances assisted the victim from the lounge to a parked car because she was drunk and boisterous. The |2next thing the victim remembered was being outside of the car on the sidewalk with Ms. Taylor helping her put her clothes back on. She did not remember how she got from the car to the sidewalk or how her clothes were removed. She denied knowing Cleveland or seeing him outside the Bridge Lounge that evening. She did not consent to having sex with him. The last thing she remembered from that night was arriving at a local hospital with Ms. Taylor and undergoing a rape exam. She spoke with two detectives at the hospital and told them that she did not recall consenting to or having oral sex with anyone that night. The following day, the victim spoke with her friend Isaiah Boyd, who was at the lounge with her the previous night.
On cross-examination as on direct, S.H. admitted that she had several drinks at the crawfish boil, and that she had several more drinks later that evening at the Bridge Lounge. She also admitted to having smoked marijuana at about 1:00 p.m. on that day and also having taken Valium. The victim remembered telling the nurse at the hospital that she was confused about the night’s events and did not know how many drinks she had had.
Ms. Taylor testified that she and the victim had been friends since high school and were together on the night of 23 May 2010. She met the victim that day about 3:00 p.m. at a crawfish boil located on the river. During the two hours that she and the victim spent at the crawfish boil, they both drank daiquiris. From the crawfish boil, they went to the Bridge Lounge at about 6:00 p.m. and continued to drink. At about 9:00 p.m., the victim was drunk and getting very loud. Consequently, Ms. Taylor’s friend, Robin, escorted the victim to Ms. Taylor’s car, which was parked on the side of the lounge, and placed her in the front seat. Robin | ..¡returned to the lounge and gave Ms. Taylor her car keys. A few moments later, two male friends entered the lounge and told Ms. Taylor that the victim was in the street unclothed. She went outside and found the victim on the curb next to Ms. Taylor’s car. (It took multiple individuals to lift the victim from the ground.) The victim was in a daze and unable to tell Ms. Taylor what had happened. She redressed the victim and drove her to the hospital.
During cross-examination, Ms. Taylor advised the court that she did not know Cleveland, and that she did not see him in the Bridge Lounge on the night of 23 May 2010. She did not witness the victim engage in any sexual act with Cleveland. Though Ms. Taylor recalled speaking to two detectives that night, she could not remember what the conversations were about.
The victim’s friend, Isaiah Boyd, recounted that he and the victim had been friends since grade school. He recalled running into the victim at the Bridge Lounge on 23 May 2010. They reminisced and had a drink. He received a telephone call just before nightfall and left the lounge. When he returned to the lounge *582 thirty-five to forty-five minutes later, he did not see the victim, so he had a drink, and thereafter left. As he walked to his car, he saw three people, one woman and two men, on the ground engaged in sexual activity that he assumed was consensual. As he made a telephone call in his car, the bartender from the lounge came outside and told the three people they had to leave. Because the bartender was his friend, Mr. Boyd approached the three people to help in dispersing them. Mr. Boyd noticed the female lying on the ground with her clothes open. One male was at her upper torso, and the second was on her lower torso. The women’s breasts were exposed, and one of the men was sucking on the woman’s breasts. The second man had his head between the woman’s legs. Mr. Boyd identified |4CleveIand as the man with his head between the woman’s legs. After the bartender told the three people to leave, another man walked around the corner and screamed, “That’s [the victim].” That being said, Mr. Boyd reentered the lounge and informed the victim’s friends. By that time, the two men had departed, and the victim remained motionless on the ground. The victim’s friends placed the victim in one of their cars. The following day, the victim called him and asked what happened the night before. He related to her what he observed that night, and she burst into tears.
Wayne Jolla, the bartender at the Bridge Lounge on the night of this incident, testified that the victim arrived at the lounge with friends at about 6:00 p.m. During the night, he prepared one Mojito for her. At about 8:30 p.m., her friends took her outside because they said she was inebriated. Mr. Jolla said S.H. appeared tipsy but not drunk. Later that night at about 10:15 p.m., a man in the bar told Mr. Jolla, “Something is going on on the side of the bar you need to go take a look at.” Mr. Jolla went outside and found the victim on the ground, naked and unresponsive. One of the two men on the victim had his mouth on the victim’s vagina, and the other was down there with “his stuff’ in his hand. Mr. Jolla said that the victim seemed to be highly intoxicated — that she did not know what was going on. When he told the two men to disperse, they walked in opposite directions. Mr. Jolla went into the bar and informed the victim’s friends, who redressed her, called the police, and drove her to the hospital.
Detective Clifton Neely of the New Orleans Police Department (“NOPD”) Sex Crimes Division met the victim at University Medical Center at about 3:30 a.m. on 24 May 2010. He found her incoherent and intoxicated to the point that she was unable to give him a statement. The following day, Detective Neely spoke |sto some witnesses and developed Cleveland as a suspect, and thereafter, he secured an arrest warrant for him. Detective Neely compiled a six-person lineup, which he presented to Isaiah Boyd. Mr. Boyd told him that he could not be sure that Cleveland was in the lineup, so the detective wrote “negative lineup” on the photos and put them in his folder. Detective Neely showed Mr. Boyd a copy of the lineup from which Mr. Boyd positively identified Cleveland as the person he saw outside the Bridge Lounge with the victim. Detective Neely spoke with the victim on one occasion following their initial interview, but she was never able to remember the events the night of the assault. The facts Detective Neely gleaned were obtained from the victim’s friends.
Ashly Butler, Cleveland’s friend and coworker, testified that he and Cleveland worked together for about two months at the time of the occurrence of the incident. The day after the incident Cleveland arrived late for work in a frantic and dishev *583 eled condition. He told his boss, Paul Tufaro, that he had hooked up with a young black woman the night before. He explained that the woman stumbled out of the Bridge Lounge obviously intoxicated. He approached her, and she told him she wanted him to perform oral sex on her, which he did. Mr. Butler asked Cleveland, “Well, did you f— her,” and Cleveland replied “no.” Cleveland mentioned to him that during the oral copulation, a “Mexican” man tried to “get in on the action,” but Cleveland shooed him away. Mr. Butler said that Cleveland claimed the woman spoke, but did not say that she was necessarily incoherent, during the sex act.
Paul Tufaro, Cleveland’s employer at the time of the incident, recounted that he received a call from Cleveland at about 7:00 a.m. on 24 May 2010, in which Cleveland said he would be late for work. Cleveland explained that a strange | (-.occurrence happened the night before that kept him up all night and that he was not sure if it was worth it. When Cleveland arrived at work, he proceeded to explain to Mr. Tufaro and Mr. Butler what had happened the night before. He said that a woman stumbled out of the Bridge Lounge and asked him to perform oral sex on her, which he did. Cleveland claimed that the "victim was coherent and that she wanted him to perform oral sex on her. Cleveland said that eventually the bartender came outside and ran him away. Mr. Tufaro thought Cleveland’s story was very strange, so he called the Bridge Lounge to confirm what Cleveland had said. The lounge employee gave Mr. Tufaro the name of the investigating officer, whom Mr. Tufaro called and related what Cleveland had told him.
Dr. William J. George, an expert in toxicology, testified for the defense. The doctor testified that he reviewed S.H.’s medical records. The testing results for marijuana indicated that the victim had ingested the drug, but he could not specify when and how much of the drug she had consumed. Testing was positive for the presence of benzodiazepines in the victim’s system; however, the victim’s blood was not tested for the presence of alcohol. Based upon information he received relative to the victim’s consumption of four drinks on the night of the incident, Dr. George opined that the victim would have been “high” but not close to unconsciousness, and legally intoxicated.
On cross-examination, Dr. George confirmed that if the victim had ingested marijuana, Valium, and alcohol in a relatively short time, she would be very intoxicated.
Misa Eiritz of the Public Defender’s Office testified that she interviewed Mr. Jolla about what beverages he served the victim at the Bridge Lounge on the night of the incident. He told her that he served the victim one alcoholic drink and |7water. She also said that Mr. Jolla told her that when he went outside to where the victim was, Cleveland said to him, “Why are you shooing me away? I didn’t do anything wrong.”

ERRORS PATENT

A review of the record reveals one error patent regarding Cleveland’s sentence. The trial court failed to specify that the sentence was to be served without benefit of parole, probation, or suspension of sentence as mandated by La. R.S. 14:43. However, in instances where the statutory restrictions were not recited at sentencing, they are contained in the sentence, whether or not imposed by the sentencing court. La. R.S.15:301.1 A; State v. Williams, 00-1725, p. 10 (La.11/28/01), 800 So.2d 790, 799. Consequently, this court need not take any action on this error.

*584
PRO SE ASSIGNMENT OF ERROR NUMBER 1

When multiple issues are raised on appeal, and sufficiency of the evidence is one of the alleged errors, a reviewing court should first determine whether the evidence is sufficient. State v. Hearold, 603 So.2d 731, 734 (La.1992). Consequently, Cleveland’s first pro se assignment of error — the evidence is insufficient to support his conviction for simple rape — is considered first.
The standard of appellate review for sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A reviewing court is to consider the record as a whole, not just the evidence favorable to the prosecution; and, if rational triers of fact could disagree |Ras to the interpretation of the evidence, the rational decision to convict will be upheld. State v. Mussall, 523 So.2d 1305, 1310 (La.1988).
Cleveland argues that his conviction cannot stand because the state failed to produce an eyewitness to the beginning of the encounter between himself and the victim.
Either direct or circumstantial evidence may prove the essential elements of the crime. With circumstantial evidence the rule is: “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” La. R.S. 15:438. This rule is not a separate test from the review standard established by Jackson v. Virginia, but rather it is an evidentiary guideline which facilitates appellate review of the sufficiency of the evidence. State v. Jacobs, 504 So.2d 817, 820 (La.1987). Ultimately, to support a conviction, the evidence, whether direct or circumstantial or both, must be sufficient under Jackson to satisfy any rational trier of fact that the defendant is guilty beyond a reasonable doubt. See State v. Sutton, 436 So.2d 471, 474 (La.1983). Credibility determinations are within the discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence. State v. Vessell, 450 So.2d 938, 943 (La.1984).
La. R.S. 14:43 defines simple rape, in pertinent part, as:
A. Simple rape is a rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of a victim because it is committed under any one or more of the following circumstances:
(1) When the victim is incapable of resisting or of understanding the nature of the act by reason of a stupor or abnormal condition of mind produced by an intoxicating agent or any cause and the offender knew or should have known of the victim’s incapacity.
|9In the present case, the state had to prove that the oral sexual intercourse with the victim was committed without her lawful consent because it was committed when she was incapable of resisting or of understanding the nature of the act by reason of a stupor or abnormal condition of mind produced by an intoxicating agent, ie., alcohol or any other cause, that the offender knew or should have known of her incapacity.
The state presented sufficient evidence to support Cleveland’s conviction for simple rape.
S.H. testified that on the day of the offense she had taken Valium in the morning and smoked marijuana in the afternoon. She said she had several drinks at *585 the crawfish boil and several more that night at the Bridge Lounge. She did not know Cleveland, had not seen him at the Bridge Lounge, and did not consent to a sexual encounter with him. The victim stated that she had no memory of the event, and in fact, the last thing she could remember was waking up on the sidewalk with Cleveland’s face between her legs.
Ms. Taylor recalled that the victim drank daiquiris for two hours at the craw-fish boil. Later in the evening, the victim drank a Mojito and beer at the Bridge Lounge until approximately 9:00 p.m., when Robin, Ms. Taylor’s friend, placed the victim in Ms. Taylor’s car because the victim was loud and drunk. A few moments after the victim was escorted out of the lounge, two of the victim’s friends informed Ms. Taylor that the victim was in the street unclothed. The victim was in a daze and unable to explain what had happened to her.
Mr. Boyd testified that he encountered the victim in the early evening at the Bridge Lounge, and the two drank. He left the lounge for a short while and when he returned, he did not see the victim, so he left. As he was leaving, Mr. Boyd saw | inthe victim on the ground with two men performing a sexual act on her. Cleveland had his head between the victim’s legs. She was unclothed and nonresponsive. Mr. Boyd recalled dispersing the men and then going back into the lounge to alert the victim’s friends. The victim remained motionless on the ground.
Mr. Jolla, the Bridge Lounge bartender that night, found the victim on the ground after he alerted her friends. He clearly recalled seeing her naked and unresponsive. He described her condition as highly intoxicated and not knowing what was going on. The defense offered no evidence to refute the state’s case that the victim was incapable of resisting Cleveland or of understanding the nature of the act by reason of stupor or abnormal condition of mind produced by an intoxicating agent.
This assignment has no merit.

COUNSEL ASSIGNMENT OF ERROR NUMBER 1

In counseled assignment of error number one, Cleveland complains that the trial court erred in denying his challenges for cause as to five prospective jurors. He maintains that the error forced him to exhaust his peremptory challenges to excuse juror numbers five, nine, thirteen, and sixteen, who said that they or loved ones were victims of sexual abuse, and juror number twenty-five, who erroneously believed that the “[defense had] to prove their client is innocent of the charge.”
The state responds that the trial court did not err in denying Cleveland’s challenges for cause as to the prospective jurors at issue. The state further responds that the voir dire as a whole was conducted in a fair and impartial manner and, therefore, the trial court did not abuse its discretion.
Article I, § 17 of the Louisiana Constitution guarantees that “[t]he accused shall have the right to full voir dire examination of prospective jurors and to ^challenge jurors peremptorily.” Prejudice is presumed when the trial court erroneously denies a challenge for cause, and the defendant ultimately exhausts his peremptory challenges. State v. Campbell, 06-0286, p. 70 (La.5/21/08), 983 So.2d 810, 856. On appeal, a defendant must show that when the trial court erroneously denied his challenge for cause, he used one of his peremptory challenges curatively to remove that juror, thereby reducing his number of peremptory challenges. Campbell, p. 71, 983 So.2d at 856.
*586 The grounds for a challenge for cause are set out in La.C.Cr.P. art. 797 which provides in pertinent part:
The state or a defendant may challenge a juror for cause on the ground that:
* * *
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
* * *
(4)The juror will not accept the law as given to him by the court[.]
A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror’s responses as a whole reveal facts from which bias, prejudice, or inability to render judgment according to law may be reasonably implied. However, when a prospective juror has voiced an opinion seemingly prejudicial to the defense, but after further inquiry (frequently called “rehabilitation”), the juror demonstrates the ability and willingness to decide the case impartially according to the law and evidence, a challenge for cause is not warranted. State v. Anthony, 98-0406, pp. 22-23 (La.4/11/00), 776 So.2d 376, 391.
112The trial court is vested with broad discretion in ruling on challenges for cause and its ruling will only be reversed when a review of the voir dire record as a whole reveals an abuse of discretion. Id. The trial court' has great discretion in ruling on cause challenges because it “has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questioning.” Id., p. 24, 776 So.2d at 392.
In this case, each of the aforementioned jurors was questioned privately in the judge’s chambers concerning the specifics of the emotional effects of the sexual abuse visited upon him/her and/or his/her loved ones. Despite initial hesitation on their parts, they all indicated that they could put their personal feelings aside. Moreover, their answers indicated that they understood the presumption of innocence, the state’s burden of proof, and the requirement that determination of guilt or innocence was only to be made based upon evidence and testimony at trial. The voir dire as a whole indicates that the trial judge did not abuse his discretion in determining that the jurors' demonstrated a willingness and ability to decide the case impartially according to the law and evidence. Their responses, as a whole, do not reasonably imply bias or prejudice.
As for juror number twenty-five’s misunderstanding the burden of proof, believing it was a defendant’s duty to disprove his guilt, the trial judge refused to grant the defense challenge deferring to the prosecutor’s explanation that the jurors could not be expected to have a “full grasp on everything.” Moreover, defense counsel explained to the jurors juror number twenty-five’s mistake through the following exchange during voir dire:
Defense counsel: Alright. Now, what does the defense have to do, Ms. Givens?
| i3Ms. Givens: They have to prove their client is innocent of the charge.
Defense counsel: Mr. Johnson (prospective juror) do you agree with that:
Mr. Johnson: No, I disagree.
Defense counsel: Well, what do you think?
Mr. Johnson: They don’t have to do anything.
*587 Defense counsel: Alright. So even if I don’t do anything, we sit there the entire time, we kind of go to sleep in the back of the room. What still matters is that they do, right?
Mr. Johnson: Yes.
Defense counsel: It’s what they do, whether they can prove their case, does that make sense to everybody?
The jurors: (Affirmative responses.)
Thus, although Ms. Givens at first was mistaken about the burden of the state, after further discussion by the jurors and defense counsel, she and the other jurors agreed that the state must prove its case.
The Louisiana Supreme Court made it clear in State v. Kang, 02-2812, p. 8 (La.10/21/03), 859 So.2d 649, 655, that courts of appeal are to give proper deference to the trial court’s findings with respect to voir dire, and that a prospective juror’s responses during voir dire should be viewed as a whole, and not on a piecemeal basis. Viewing the voir dire as a whole, we find nothing to suggest that juror number twenty-five exhibited any partiality to the defense or the state or that she did not understand or accept the legal precepts in this case.
This assignment is meritless.

J[¡¿COUNSEL ASSIGNMENT OF ERROR NUMBER 2

By counsel’s second assignment of error, Cleveland argues that the trial court erred by refusing to give the jury a special instruction on the definition of “stupor.”
La.C.Cr.P. art. 802 requires the trial court to charge the jury as to the law applicable to the case. Under La.C.Cr.P. art. 807, a requested special jury charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. The special charge need not be given if it is included in the general charge or in another special charge to be given. State v. Segers, 355 So.2d 238, 244 (La.1978). Failure to give a requested jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right. La. C.Cr.P. art. 921; State v. Marse, 365 So.2d 1319, 1322-24 (La.1978). In charging the jury on the definition of simple rape, the trial judge read La. R.S. 14:43 A(l) and (2). He also instructed the jury:
So, to find the defendant guilty of simple rape you must find that the defendant committed an act of sexual intercourse with the victim and that this act was without the lawful consent of the victim because the victim was incapacitated by reason of stupor or abnormal condition of mind from any cause and the offender knew or should have known of such abnormality; or because the victim was incapable through unsoundness of mind, whether temporary or permanent, of understanding the nature of the act and the offender actually did know, then you shall find the defendant guilty of simple rape.
The defendant herein requested the following special instruction:
You must not find Scott Cleveland guilty unless you find that the state proved beyond a reasonable doubt that [the victim] was incapable of resisting or of understanding the nature of the | )sact by reason of a stupor or abnormal condition of mind produced by an intoxicating agent.
To prove simple rape, under the law, the state must prove beyond a reasonable doubt that [the victim] was in a stupor or abnormal condition of mind that cause [sic] to be incapable *588 of resisting or understanding the nature of the act.
To prove that [the victim] was in a stupor, the state must prove beyond a reasonable doubt that [the victim] was in the condition of being almost unconscious or in a state of insensibility during the act.
You therefore must acquit Mr. Cleveland if the state has not proved beyond a reasonable doubt that [the victim] was in the condition of being almost unconscious or in a state of insensibility during the act.
Cleveland offers no legal support for the definition of “stupor” as included in his proposed special jury instruction. Although he cites several cases (State v. Fruge, 09-1131 (La.App. 3 Cir. 4/7/10), 34 So.3d 422; State v. Jones, 45,450 (La.App. 2 Cir. 8/11/10), 46 So.3d 711; State v. Starr, 08-341 (La.App. 5 Cir. 11/25/08), 2 So.3d 451; and State v. Rogers, 99-1378 (La.App. 5 Cir. 11/28/00), 772 So.2d 960), none of them defines stupor as “being almost unconscious.” Further, we find no indication from the record that the jury did not understand the meaning of the word stupor, as it did not seek clarification of the term from the court. Neither is there any argument or evidence that the trial court’s refusal to give the proposed jury charge prejudiced Cleveland in any way. Based upon the evidence, it was not unreasonable for the jury to conclude that the victim was in a stupor or of abnormal condition of mind that caused her to be incapable of resisting or understanding the nature of the act.
This assignment is without merit.
| mPRO SE ASSIGNMENT OF ERROR NUMBER 2
In his second pro se assignment, Cleveland complains that his fifteen year sentence is excessive.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La.C.Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. See State v. Smith, 433 So.2d 688, 698 (La.1983). Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La.C.Cr.P. art. 894.1; see also State v. Lanclos, 419 So.2d 475, 478 (La.1982).
Whether a sentence imposed is too severe depends on the circumstances of the case and the background of the defendant. A sentence violates La. Const, art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276, 1280-81 (La.1993). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. See State v. Hogan, 480 So.2d 288, 291 (La.1985); see also State v. Bonanno, 384 So.2d 355, 358 (La.1980); State v. Goode, 380 So.2d 1361, 1364 (La.1980).
A trial court has broad discretion to sentence within the statutory limits. Absent a showing of manifest abuse of that discretion, an appellate court may not set aside a sentence as excessive. State v. Guzman, 99-1528, 99-1753, p. 15 (La.5/16/00), 769 So.2d 1158, 1167.
|17Here, although the record does not indicate that the trial judge considered the La.C.Cr.P. art. 894.1 criteria, we find an adequate factual basis for the sentence imposed.
*589 A conviction for simple rape carries a maximum sentence of twenty-five years. Cleveland in this case received a sentence of fifteen years, a little beyond a mid-range sentence. Other jurisdictions have found like sentences not to be excessive. See State v. Greenwalt, 41,145 (La.App. 2 Cir. 8/23/06), 938 So.2d 1073 (fifteen years not excessive); State v. Jeansonne, 06-263 (La.App. 3 Cir. 5/31/06), 931 So.2d 1258 (twenty years not excessive); State v. Williams, 05-0673 (La.App. 5 Cir. 3/14/06), 926 So.2d 665 (fifteen years not excessive).
This assignment is without merit.

PRO SE ASSIGNMENT OF ERROR NUMBER 3

In this assignment, Cleveland complains that the exclusion of evidence of the victim’s sexual activity immediately prior to meeting him was improper and prejudicial.
Cleveland does not cite any specifics with regard to where in the record or by which witness’ testimony the supposed evidence of the victim’s sexual activity was sought to be introduced. He makes an oblique reference to anal swabs; however, no medical testimony of any DNA testing performed in this case exists. In fact, the only medical witness was Dr. George, an expert in toxicology, who testified for the defense. Dr. George’s testimony was limited to the effects of alcohol and drugs on a person’s cognition and motor skills.
This assignment lacks merit.

UtPRO SE ASSIGNMENT OF ERROR NUMBER 4

In this final pro se assignment, Cleveland argues that he was prejudiced by the prosecutor’s expressing his opinion of Cleveland’s guilt and referring to defense counsel as a liar.
In State v. Clark, 01-2087, p. 15 (La.App. 4 Cir. 9/25/02), 828 So.2d 1173, 1183, this court set forth the standard for determining whether a prosecutor’s remarks are so prejudicial as to warrant a new trial:
The scope of closing argument “shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. The state’s rebuttal shall be confined to answering the argument of the defendant.” La.C.Cr.P. art. 774. Prosecutors may not resort to personal experience or turn argument into a plebiscite on crime. State v. Williams, 96-1023, p. 15 (La.1/21/98), 708 So.2d 703, 716. However, prosecutors have wide latitude in choosing closing argument tactics. State v. Casey, 99-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036, citing State v. Martin, 539 So.2d 1235, 1240 (La.1989) (closing arguments that referred to “smoke screen” tactics and defense as “commie pinkos” were deemed inarticulate but not improper). Further, the trial judge has broad discretion in controlling the scope of closing arguments. Id. Even if the prosecutor exceeds the bounds of proper argument, a reviewing court will not reverse a conviction unless “thoroughly convinced” that the argument influenced the jury and contributed to the verdict. State v. Ricard, 98-2278, p. 4 (La.App. 4 Cir. 1/19/00), 751 So.2d 393, 397.
Even where the prosecutor’s statements are improper, credit should be accorded to the good sense and fair-mindedness of the jurors who have heard the evidence. Williams, 96-1023, p. 15 (La.1/21/98), 708 So.2d 703, 716; Ricard, 98-2278, p. 4 (La.App. 4 Cir. 1/19/00), 751 So.2d 393, 397.
The record does not support Cleveland’s argument. Cleveland does not *590 provide the location of the complained of remarks in the record, and we are unable to find any reference to the prosecutor calling defense counsel a liar or articulating |]9his personal opinion that Cleveland was guilty. During closing argument, the prosecutor did point out Cleveland as the man who raped the victim; however, that reference is within allowable limits as the prosecutor’s opinion of what the facts of the case proved.
Finally, we find no reference to defense counsel as a liar in the state’s closing argument. The prosecutor was highlighting defense counsel’s suggestion to the jury that the state’s witnesses were liars. We find no indication that Cleveland was prejudiced by anything said during the state’s closing arguments or that the argument somehow contributed to the verdict.
This assignment is without merit.

CONCLUSION

For the foregoing reasons, we affirm the conviction and sentence of Scott G. Cleveland.
AFFIRMED.

. The victim’s privacy is protected in this opinion by the use of her initials, S.H.