**STATE of Louisiana**

v.

**Darrell GEORGE**

NO. 2015–KA–1189

Court of Appeal of Louisiana, Fourth Circuit.

November 9, 2016

Leon A. Cannizzaro, Jr., District Attorney, Mithun Kamath, Assistant District Attorney, Parish of Orleans, 619 South White Street, New Orleans, LA 70119, COUNSEL FOR THE APPELLEE/STATE OF LOUISIANA

Sherry Watters, Louisiana Appellate Project, P. O. Box 58769, New Orleans, LA 70158–8769, COUNSEL FOR DEFENDANT/APPELLANT

(Court composed of Chief Judge James F. McKay, III, Judge Edwin A. Lombard, Judge Joy Cossich Lobrano)

Judge Joy Cossich Lobrano

Darrell George ("Defendant") appeals his convictions for one count of manslaughter and one count of attempted manslaughter, and his adjudication and sentencing on both counts as a second-felony habitual offender on the grounds that the State of Louisiana ("State") failed to prove that his actions were not justified and were not in self-defense. In furtherance of that challenge, Defendant asserts that the State's burden of proof was eased due to the district court's failure to give a requested jury instruction. Defendant also appeals his sentences, averring that the district court erred in adjudicating him a second-felony habitual offender, and that his sentences are unconstitutionally excessive. Finding that, under the standard articulated in *Jackson v. Virginia*, 443 U.S. 307, 99

S.Ct. 2781, 61 L.Ed.2d 560 (1979), the evidence is sufficient and Defendant's actions were not justified as self-defense, we affirm Defendant's convictions. Further, we find that the district court did not err in adjudicating Defendant a second-felony habitual offender, and that Defendant's sentences are not unconstitutionally excessive. However, finding a patent error, we vacate only the portion of the sentences denying Defendant parole, and amend the sentences accordingly.

## PROCEDURAL AND FACTUAL BACKGROUND

Defendant was charged by grand jury indictment on June 6, 2013, with second degree murder (Count 1) and with attempted second degree murder (Count 2). Defendant pled not guilty at his June 11, 2013 arraignment. Defendant was tried by a twelve-person jury on March 10–12, 2015, at the conclusion of which he was found guilty of manslaughter (Count 1) and guilty of attempted manslaughter (Count 2). On May 14, 2015, the district court denied Defendant's motion for a new trial and, after Defendant waived sentencing delays, he was sentenced to forty years at hard labor on Count 1 and twenty years at hard labor on Count 2, both sentences being without the benefit of parole, probation or suspension of sentence. Defendant was adjudicated a second-felony habitual offender over the objection of defense counsel. The district court vacated the original sentences and resentenced Defendant to eighty years at hard labor on Count 1 and forty years at hard labor on Count 2, both sentences again being without the benefit of parole, probation or suspension of sentence. Defendant filed a motion to reconsider the sentences as unconstitutionally excessive, which the district court denied. Defendant filed a notice of appeal that date, which was granted by the district court. This timely appeal follows.

Defendant's conviction for manslaughter stems from the shooting death of Terrell Jackson ("Jackson") and his attempted manslaughter conviction stems from the shooting of Braeion Henderson ("Henderson"). At trial, the State presented testimony from several witnesses. The testimony of the State's main witnesses are summarized as follows:

Dr. Erin O'Sullivan, ("Dr. O'Sullivan") qualified by stipulation as an expert in the field of forensic pathology, performed an autopsy on Jackson. Dr. O'Sullivan testified that Jackson sustained three gunshot wounds. She said that in wound one, the bullet entered the back right side of his head and traveled straight from back to front, through the right side occipital temporal and parietal lobes of the brain. She said the path of this bullet did not "really deviate left to right or up or down," and it did not exit Jackson's body. In wound two, the bullet entered the upper abdomen through the space above the ninth rib, traveled right to left, slightly upward and slightly front to back, penetrating the liver and stomach, and resulting in approximately 1,000 ml. of blood accumulation in the abdomen. This bullet did not exit Jackson's body either. Dr. O'Sullivan further testified that in wound three, the bullet entered the upper left side of the back, passed through subcutaneous fat and superficial muscle of the posterior left arm, and exited on the back of the left arm. Dr. O'Sullivan opined that either wound one or two "could be fatal." She also noted that there was no stippling on the victim; thus it appeared that the gun had been fired from three or more feet away and that a struggle over the gun had not occurred.

NOPD (New Orleans Police Department) Officer Wilfred Eddington ("Officer Eddington") testified that he was a quality of life officer assigned to the Second Police

District on September 24, 2012. On that date, he was heading to a quality of life matter when he heard a dispatch of a shooting in the area of Cohn and Cambronne Streets. He was about six blocks away. He testified that while enroute to the scene, around what he later confirmed was the corner of Hickory and Cambronne Streets, he saw a young male, later identified as Henderson, suffering from a gunshot wound to his right arm. He stopped and frisked Henderson—who was yelling for the officer to help his friend who had been shot—put him in his vehicle, and drove to the scene, where he was the first officer to arrive. He observed a male, later identified as Jackson, lying with his face up in pool of blood, bleeding heavily with multiple gunshot wounds to his body and head, and exhibiting no signs of life. Officer Eddington could smell the odor of burned gunpowder in the air. He also stated that Henderson subsequently sought medical attention on his own.

NOPD Sergeant Jimmy Turner ("Sgt. Turner") testified that he was the homicide supervisor on the case. When he arrived on the scene, he noticed a female in the back of a patrol car, acting belligerently. She later was determined to be Defendant's sister, Geralda Johnson ("Johnson"). Sgt. Turner testified that it was determined the incident began inside Johnson's apartment. During a search of her apartment pursuant to a warrant, a fully-loaded .40 caliber Smith & Wesson firearm was recovered from between a mattress and a box spring. Sgt. Turner confirmed that Defendant was developed as a suspect while he was on the scene.

Meredith Acosta, an NOPD Crime Lab firearms examiner ("Acosta"), was qualified by stipulation as an expert in the field of firearms and ballistic identification and testing. Acosta examined the spent cartridge casings found at the scene, as well as the firearm discovered during the search of Johnson's apartment. She testified that her examination revealed that all six of the spent cartridge casings recovered from the crime scene were 9mm caliber, and all had been fired by the same firearm. She further testified that two spent bullets recovered during the autopsy of Jackson and one recovered at the scene were in the .38 caliber class, which included 9mm caliber, and that all three had been fired by the same firearm. She confirmed that the firearm she was asked to test, the .40 caliber semiautomatic Smith & Wesson handgun recovered from Johnson's apartment did not match the projectiles or the casings.

Johnson, who was called as a witness by the State, twice refused to swear to take the oath to tell the truth. She finally did so the third time she was asked. She testified that in September 2012 she was living on Cohn Street with her children and her sister Michelle. The prosecutor referred to her as being currently incarcerated and asked her if she was appearing in court voluntarily. She replied in the negative, as she was being held as a material witness.

Johnson confirmed that, on September 24, 2012, she was dating Henderson. She testified that she did not remember if Henderson and Jackson had been at her residence on September 24, 2012, at any point. Johnson replied in the negative when asked whether she remembered Henderson being shot and Jackson being killed. After several unresponsive answers, the district court declared her a hostile witness. Thereafter, Johnson repeatedly replied in the negative when asked questions by the prosecutor about the day of the murder, including whether she remembered going back to her apartment, walking in, and seeing Defendant pointing a gun at Henderson and Jackson.

NOPD Detective Melinda Dillon ("Det. Dillon") testified that she was notified on September 24, 2012, that the case had been assigned to her. She was directed to go to police headquarters to interview Johnson. Det. Dillon conducted three interviews with Johnson on three different dates. Throughout the interviews, Johnson said that after picking the children up, Defendant came to the grocery store and complained to her that Henderson and Jackson were smoking marijuana around her children, then left. It was during Johnson's third interview that she admitted she was present when Defendant shot Henderson and Jackson. Johnson said Defendant's girlfriend called her at the grocery store where she was working and told her that Defendant was "trippin," and he had a gun. Johnson stated that |₆when she went to her apartment and walked upstairs, Defendant was pointing a gun at Henderson and Jackson. She told Defendant to leave the scene with her. She said he grabbed her by the neck and threw her across the room. When she stood up, Henderson and Jackson were going down the stairs with Defendant, who was following behind them. When they got downstairs they began walking, and when they reached the house on the corner, Defendant started shooting. Johnson saw Henderson get hit and fall down on the ground. Defendant then shot Jackson, who fell to the ground. Then, Defendant started shooting again, going back to Henderson, who got up and ran.

Henderson testified that on the day of the shootings, he returned home from school at Delgado College and met up with Jackson. He said he decided to go to Johnson's apartment with Jackson, because his X–Box was there. Henderson testified that Defendant and his girlfriend came over to pick up Johnson's children. After Defendant and the children left, Henderson stated that Jackson told him to lock the door,

because Jackson knew that Defendant did not like Henderson.

Henderson said he subsequently answered a knock at the door to find Defendant pointing a gun at his face. Henderson said he immediately threw his hands up in the air and backed up. He said Defendant came through the doorway and told them to "get the f--- out." He said Johnson came in and tried to intercede, but Defendant shoved her off. Henderson said Jackson then entered the room with his hands up, and Jackson was basically shielding him from Defendant the entire way out.

Henderson testified that Defendant shot Jackson first, then him. Henderson said he ran around the corner of Cambronne Street toward Hickory Street, where his cousin lived. He stopped once he made the corner, and a police officer pulled |₇up. The prosecutor then asked Henderson to display his gunshot wound scar to the jury. The State rested its case in chief at the conclusion of Henderson's testimony and its introduction of evidence.

Defendant testified that he went to prison at age fifteen, on a ten-year sentence for armed robbery, of which he served nine years and three and one-half months. Then, Defendant admitted that he shot both Henderson and Jackson. However, he denied that he shot them because they were smoking marijuana in front of his nieces and nephew. He said he shot them because Jackson pulled a gun on him.

Defendant testified that he arrived home from work on his bicycle at 5:00 p.m., passing by Johnson's apartment on the way home. He claimed he saw Henderson come out of Johnson's apartment, walk down the steps, hand something to a male in a car, receive something that he put in his pocket, and go back upstairs into the apartment. Defendant said it looked like a drug deal, but that he did not call the

police. He told his girlfriend what he had seen, and they went to Johnson's apartment to get the children.

Defendant testified that Henderson answered Johnson's door. Henderson, Jackson, and the three children were inside Johnson's apartment. Defendant said he walked through the residence and observed a bag of foil packages on the bed, which he said he knew was heroin. He did not say anything to Henderson at that time. He and his girlfriend took the children with them, and went to talk to Johnson about what he had seen. Defendant said Johnson downplayed his concerns, so he went directly from the grocery store to Johnson's apartment and knocked on the door, whereupon Henderson answered again.

Defendant testified that he did not have a gun with him. He said he confronted Henderson outside the front door, asking him what he was doing selling drugs out of the apartment. He stated that Jackson came outside and asked Henderson why he was talking with Defendant, saying that they were done talking and telling Defendant to go away. Defendant said the two men began walking towards him, and he began backing down the steps, holding onto the iron railing.

Defendant admitted calling Jackson names. He said Jackson pulled out a gun. Defendant said he thought Jackson was going to kill him, and he thought about how to disarm Jackson. He said Jackson tried to fire the gun, but it just clicked. He stated that while Jackson was trying to "clear" the gun he charged Jackson, disarmed him, and fired the gun in the direction of Henderson and Jackson. He could not remember how many shots he fired. He then ran. He did not know at the time that anyone died, but he later learned that Jackson had died. Defendant testified that he never turned himself in, but instead was arrested six months later during a traffic stop. The defense rested following Defendant's testimony.

## ERRORS PATENT

A review of the record reveals a patent error as to both the original and habitual offender sentences, which specifically deny Defendant the possibility of parole. The sentencing provision of the manslaughter statute, La. R.S. 14:31(B), does not provide for the denial of the benefit of parole to a defendant convicted of manslaughter. The sentencing provision in the attempt statute that is applicable to an attempt to commit a crime such as manslaughter, La. R.S. 14:27(D)(3), simply provides, in pertinent part, that the offender be imprisoned "in the same manner as for the offense attempted," meaning, in this case, as per the sentencing provision in the manslaughter statute. The applicable provision of the Habitual Offender Law under which Defendant was sentenced as a second-felony habitual offender, La. R.S. 15:529.1(A)(1), merely provides for imprisonment for a determinate term not less than one-half the longest term and not more than twice the longest term prescribed for a first conviction. Although another provision of the Habitual Offender Law, La. R.S. 15:529.1(G), provides that "[a]ny sentence" under the Habitual Offender Law "shall be at hard labor without benefit of probation or suspension of sentence," there is no provision for the denial of the benefit of parole to a second-felony habitual offender in Defendant's circumstances. The district court error as to the imposition of the original sentences without the benefit of parole is harmless, given that the district court vacated both sentences before resentencing Defendant as a second-felony habitual offender. However, insofar as the two habitual offender sentences, the portion of the sentences denying Defendant the possibility of parole is

vacated, and the sentences are amended to allow for the possibility of parole.[1]

## ASSIGNMENT OF ERROR NUMBER 1

 In his first assignment of error, Defendant argues that the State failed to prove beyond a reasonable doubt that he did not act in self-defense, and thus the evidence is insufficient to support his convictions. Within this assignment of error, Defendant also argues that the district court erred with regard to a jury instruction relating to an aggressor generally being unable to claim self-defense unless he clearly withdraws from the conflict. An error as to a jury instruction constitutes a "trial error." *See State v. Hongo*, 96–2060, p. 3 (La. 12/02/97), 706 So.2d 419, 421–22. "When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, we [the reviewing court] first determine the sufficiency of the evidence." *State v. Marcantel*, 2000–1629, p. 8 (La. 4/3/02), 815 So.2d 50, 55 (internal citations omitted).

 "In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *State v. Huckabay*, 2000–1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1110 (citing *Jackson*, 443 U.S. 307 at 99, 99 S.Ct. 2781, 61 L.Ed.2d 560; *State v. Green*, 588 So.2d 757, 758 (La. App. 4 Cir. 1991). "The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction." *State v. Wells*, 2010–1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306 (internal citations omitted).

Manslaughter is defined, in relevant part, as:

A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder),[2] but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection....

La. R.S. 14:31(A)(1). As for attempted manslaughter, attempt is defined, in relevant part, as "[a]ny person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose." La. R.S. 14:27(A). Thus, for Defendant to |₁₁have been convicted of manslaughter by sufficient evidence, a rational jury must have been able to conclude, beyond a reasonable doubt, that Defendant: (1) killed a human being, (2) with "a specific intent to kill or to cause great bodily harm,"[3] where the jury found the Defendant acted "in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection."[4] For the attempted manslaughter count, a rational jury must have been able to conclude, beyond a reasonable doubt, that Defendant: (1) had a specific intent to

---

**1.** *See* La. C.Cr.P. art. 882(A) (stating, "[a]n illegal sentence may be corrected at any time by the court that imposed the sentence, or by an appellate court on review").

**2.** A homicide under La. R.S. 14:30.1 is defined, in relevant part, as "the killing of a human being [w]hen the offender has a spe-

cific intent to kill or cause great bodily harm...."

**3.** La. R.S. 14:30.1.

**4.** La. R.S. 14:31(A)(1).

commit a manslaughter and (2) did or omitted an act "for the purpose of and tending directly toward"[5] committing that crime.

In the case sub judice, the State proved beyond a reasonable doubt that Defendant committed the manslaughter of Jackson and attempted manslaughter of Henderson. The testimony given at trial by Henderson, which was substantiated by Det. Dillon when she testified as to what Johnson told in her recorded statements given hours after the shootings, could lead a rational jury to find beyond a reasonable doubt that Defendant became angry at the two victims, confronted the two victims with a 9mm handgun, forced them from the apartment at gunpoint, walked them downstairs, and subsequently shot them both, leading to the killing of Jackson and injuries to Henderson.

■ However, in order to determine the sufficiency of evidence in this case, we must also address the self-defense argument raised by Defendant at trial. In a homicide case where the defendant asserts that he acted in self-defense, the State has the burden of proving beyond a reasonable doubt that the defendant did not act |₁₂in self-defense. *State v. Taylor*, 2003–1834, p. 7 (La. 5/25/04), 875 So.2d 58, 63. "The fact that an offender's conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct." La. R.S. 14:18. The defense of justification can be claimed "[w]hen the offender's conduct is in defense of persons or of property under any of the circumstances described in Articles 19 through 22." La. R.S. 14:18(7) (referencing La. R.S. 14:19–14:22). La. R.S. 14:20 defines justifiable homicide, in pertinent part, as follows:

A. A homicide is justifiable:

(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

(2) When committed for the purpose of preventing a violent or forcible felony involving danger to life or of great bodily harm by one who reasonably believes that such an offense is about to be committed and that such action is necessary for its prevention. The circumstances must be sufficient to excite the fear of a reasonable person that there would be serious danger to his own life or person if he attempted to prevent the felony without the killing.

■ At Defendant's trial, no evidence was presented indicating that either Henderson or Jackson had been armed with any type of weapon or acted in an aggressive manner, other than the self-serving testimony of Defendant. Moreover, Dr. O'Sullivan's testimony regarding the lack of stippling, Henderson's testimony regarding Defendant's actions during the shooting, and Det. Dillon's testimony regarding Johnson's account of the shooting refute Defendant's claims that he disarmed Jackson and shot him during a struggle over the gun. Viewing all the evidence in the light most favorable to the prosecution, a rational trier of fact, when comparing all of the evidence offered, could have found beyond a reasonable |₁₃doubt that Defendant did not shoot Jackson and Henderson in self-defense. Thus, the evidence is sufficient to support his convictions.

■ Having determined that the evidence was sufficient to affirm Defendant's convictions, we now turn to Defendant's argument that the district court erred in failing to give his requested instruction on

5. La. R.S. 14:27(A).

the aggressor doctrine. District courts determine whether or not to issue requested special charges based on the criteria of La. C.Cr. P. art. 807, which provides:

The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. The party submitting the charges shall furnish a copy of the charges to the other party when the charges are submitted to the court.

A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.

Appellate courts review a district court's refusal to give a requested special jury charge mindful that "[f]ailure to give a requested jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right." *State v. Cleveland*, 2012–0163, p. 14 (La.App. 4 Cir. 4/10/13), 115 So.3d 578, 587 (citing La. C.Cr. P. art. 921; *State v. Marse*, 365 So.2d 1319, 1324 (La. 1978)).

In the case *sub judice*, the requested special charge concerns the aggressor doctrine, which is defined in La. R.S. 14:21. La. R.S. 14:21 states:

A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict.

The instruction the district court gave quoted 14:21 directly, and added:

In determining whether the defendant was the aggressor you must consider the nature of the confrontation and whether the victim's actions were a reasonable response.

Thus, if you find that the defendant was the aggressor or that he brought on the difficulty, you must reject his claim of self-defense unless you find, No. 1, that he withdrew from the conflict; and, No. 2, that his withdraw [sic] was in good faith; and, No. 3, that he withdrew in a manner that put his adversary on notice that he wished to withdraw and discontinue the conflict.

Defendant requested the following special instruction be included when the district court explained the aggressor doctrine to the jury:

Mere words, without more by the defendant, do not, on their own, constitute aggression or provocation. You must determine the intentions of Mr. George and the character of his actions in making your determination regarding provocation.

■ The district court denied Defendant's request, saying it was satisfied with its own aggressor doctrine instructions. When arguing for the instruction, Defendant's counsel expressly stated at trial that all Defendant was requesting insofar as the aggressor doctrine was the instruction that "[m]ere words by the defendant do not, on their own, constitute aggressor provocation." However, the two cases relied on by Defendant in his written request for that special instruction did not support such a proposition, both stating only that "it is not every act or insulting word of a defendant that makes him an aggressor."[6]

6. Defendant relied upon *State v. Taylor*, 621 So.2d 141, 148 (La. App. 2 Cir. 1993) and

*State v. Coll*, 146 La. 597, 607–608, 83 So.2d 844, 83 So. 844 (1919).

Thus, the requested special charge was not wholly correct and would have required qualification or explanation by the court, and the district court did not err in refusing to give it. Further, since the denial of Defendant's proposed modification to the district court's aggressor ⌐₁₅doctrine instruction did not prevent Defendant from receiving an aggressor doctrine instruction that appropriately tracked the language of La. R.S. 14:21, Defendant's substantial rights were not prejudiced by the district court's denial. *See, e.g., State v. Seals*, 2009–1089 p. 68 (La.App. 5 Cir. 12/29/11), 83 So.3d 285, 338 (finding that "the trial judge did not err by refusing to read defendant's special jury instruction because it was not wholly correct under LSA–C.Cr.P. art. 807 in that it did not track the language of LSA–R.S. 15:432" where La. R.S. 15:432 was the relevant statute defining the subject matter of the special charge).

This assignment of error has no merit.

## ASSIGNMENT OF ERROR NUMBER 2

In his second assignment of error, Defendant argues that the district court erred in adjudicating him a second-felony habitual offender, asserting that reasonable doubt existed as to the validity of his prior guilty plea to armed robbery at age sixteen. For a defendant to receive an enhanced penalty under the Habitual Offender Law, La. R.S. 15:529.1, the State must prove beyond a reasonable doubt both the prior felony convictions and the defendant's identity as the person who committed the prior felonies. *State v. Brown*, 2011–1656, p. 2 (La. 2/10/12), 82 So.3d 1232, 1234. "[T]he Habitual Offender Act does not require the State to use a specific type of evidence to carry its burden at a habitual offender hearing. Rather, prior convictions may be proved by any competent evidence." *State v. White*, 2013–1525, p. 2 (La. 11/8/13), 130 So.3d 298, 300

(upholding a multiple offender adjudication where the State provided "sufficient competent evidence" to prove the convictions and the defendant's identity as the individual who committed the prior felonies) (internal citations omitted). For the following reasons, we find that the State presented sufficient competent evidence to prove the prior conviction and ⌐₁₆Defendant's identity as the person who committed the prior felonies. Thus, the district court did not err in adjudicating Defendant a second-time felony offender.

In the case *sub judice*, the habitual offender hearing was held during the same May 14, 2015 hearing at which the district court imposed the original sentences. Defendant moved for a continuance of the habitual offender proceeding, but the motion was denied. The State introduced a certified conviction packet evidencing that on July 17, 2003, in Case # 432–820, Darrell George, a black male with a date of birth of April 16, 1987, with his counsel present, pleaded guilty to one count of armed robbery, after being personally apprised and questioned by the district court regarding all of his rights, and it being found that Defendant understood those rights and was freely and voluntarily waiving them and pleading guilty. Defendant was sentenced to ten years at hard labor, without benefit of parole, probation, or suspension of sentence for the armed robbery conviction. In addition, the State introduced a transcript of Defendant's trial testimony in the present case, during which he admitted serving nine years and three-and-one-half months in prison for an armed robbery he committed with a gun. Defendant testified that he was fifteen years old when he went to prison, which is consistent with the bill of information in the certified conviction packet which charges him with a July 11, 2002 armed robbery committed with a gun,

when he would have been fifteen years old. Defendant further testified that the armed robbery was his only prior conviction. Defendant admitted on cross examination at trial that he was released from prison on December 27, 2011, after completing his sentence for armed robbery, and that he had been out of prison for approximately nine months at the time he shot Jackson and Henderson.

In *Brown*, the Louisiana Supreme Court held that the defendant's trial testimony admitting his two prior convictions, along with certified copies of those two prior convictions, were sufficient to establish beyond a reasonable doubt the existence of the prior convictions and the defendant's identity as the person who committed those prior felonies. 82 So.3d at 1234. As in *Brown*, in the case *sub judice*, the State proved beyond a reasonable doubt that Defendant was the same person convicted of armed robbery in 2003.

Further, Defendant did not present any evidence at the habitual offender hearing remotely suggesting there had been an infringement of his rights or a procedural irregularity in the taking of his guilty plea in the prior case. Nor did Defendant suggest in any way in his trial testimony that he had not freely and voluntarily pleaded guilty to armed robbery or that there had been any procedural irregularity in the taking of his plea. As for Defendant's argument that he was unable to show an infringement of his rights and an irregularity in the taking of his plea because he did not receive access to the certified conviction packet documents evidencing his 2003 guilty plea until the day of the habitual hearing, this Court has held that advanced receipt of the certified conviction documents is not required. *See State v. Dozier*, 2006–0621, p. 6 (La.App. 4 Cir. 12/20/06), 949 So.2d 502, 505 ("[T]here is

no requirement that the State submit its documentation to the defense prior to the multiple bill hearing.").

This assignment of error is without merit.

## ASSIGNMENT OF ERROR NUMBER 3

In his third assignment of error, Defendant argues that his habitual offender sentences are unconstitutionally excessive. La. Const. art. 1, § 20 explicitly prohibits excessive sentences. A sentence is unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, or it is nothing more than the purposeless imposition of pain and suffering and is grossly out of proportion to the severity of the crime. *State v. Ambeau*, 2008–1191, p. 9 (La.App. 4 Cir. 2/11/09), 6 So.3d 215, 221. A sentence is grossly out of proportion to the seriousness of the crime if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. *State v. Vargas–Alcerreca*, 2012–1070, p. 25 (La.App. 4 Cir. 10/2/13), 126 So.3d 569.

Although a sentence is within the statutory limits, the sentence may still violate a defendant's constitutional right against excessive punishment. *State v. Every*, 2009–0721, p. 7 (La.App. 4 Cir. 3/24/10), 35 So.3d 410, 417. This rule applies equally to sentences—even mandatory ones—imposed under the Habitual Offender Law, La. R.S. 15:529.1. *State v. Dorthey*, 623 So.2d 1276 (La. 1993). However, the penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society. *State v. Cassimere*, 2009–1075, p. 5 (La.App. 4 Cir. 3/17/10), 34 So.3d 954, 958.

The purpose of the Louisiana Legislature's enactment of the Habitual Offender Law was to deter and punish recidivism by subjecting defendants with

multiple felony convictions to longer sentences for their instant crimes in light of their continuing disregard for the laws of this State. *State v. Johnson*, 97–1906, p. 8 (La. 3/4/98), 709 So.2d 672, 677. To rebut the presumption that a mandatory minimum sentence under the Habitual Offender Law is constitutional, a defendant must "clearly and convincingly show" that he "is exceptional," "which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case." *Id.*

Defendant cites his self-defense argument as a mitigating factor for the purposes of downward departure. During the sentencing phase, the district court told Defendant that it did not find Defendant's testimony of a struggle with Jackson to merit leniency. Before sentencing Defendant as a second-felony habitual offender to eighty years at hard labor for manslaughter and forty years at hard labor for attempted manslaughter, the district court said that it found Defendant's actions on the day of the shootings to have been particularly heinous and savage, and that the crimes were completely unnecessary.

Defendant also cites his concern for his sister's children as a mitigating factor. However, the motion for reconsideration of sentence filed by Defendant failed to raise any grounds demonstrating that "he may have been a worthy candidate for downward departure." *State v. Ellis*, 2014–1170, p. 35 (La.App. 4 Cir. 3/2/16), 190 So.3d 354, 375, *writ denied*, 2016–0618 (La. 5/13/16), 191 So.3d 1057 (finding that where the record demonstrates that a defendant may be exceptionally unique such that a mandatory minimum life sentence may be excessive as applied to him, all relevant factors should be considered relative to the defendant's downward departure motion). Given that Defendant has failed to raise any factors that make him "noteworthy and of further consideration," his sentence cannot be considered to be excessive. *Id.; see also State v. Brundy*, 2016–0263, pp. 11–12 (La. App. 4 Cir. 8/24/16), 198 So.3d 1247, 1256–57 (finding that where a defendant only attacked the sufficiency of the evidence used to convict him in his downward departure motion, he has failed to show that he is "exceptional" for purposes of downward departure). *Compare State v. Hall*, 2014-1046, p. 19 (La. App. 4 Cir. 5/13/15), 172 So.3d 61, 72, *writ denied*, 2015–0977 (La. 6/5/15), 169 So.3d 348 (stating that where a defendant's circumstances were "noteworthy and of further consideration," a downward departure may be warranted). In fact, Defendant committed the present crimes *only nine months after he was released from prison* after serving almost ten years for another violent crime—armed robbery.

Unlike previous cases this Court has addressed where mitigating factors were in need of further development, in the case *sub judice*, several aggravating factors from La. C.Cr.P. art. 894.1(B) are apparent from the facts of the case: (1) Defendant knowingly created a risk of death or great bodily harm to more than one person; (2) Defendant used violence in the commission of the offenses; (3) Defendant used a dangerous weapon in the commission of the offenses. *Compare Ellis*, 190 So.3d at 375. It cannot be said that there were exceptional grounds tending to excuse or justify Defendant's criminal conduct.

This assignment of error has no merit.

For the reasons stated above, we affirm Defendant's convictions for manslaughter and attempted manslaughter. We affirm Defendant's adjudication as a second-felo-

ny habitual offender, as well as his sentence of eighty years of incarceration at hard labor for manslaughter and forty years of incarceration at hard labor for attempted manslaughter, without the benefit of probation or suspension of sentence, as a second-felony habitual offender. We vacate only the portion of Defendant's sentences denying him the possibility of parole, and amend both sentences to allow for the possibility of parole.

**CONVICTIONS AFFIRMED; HABITUAL OFFENDER ADJUDICATION AFFIRMED; SENTENCES AMENDED AND AFFIRMED AS AMENDED.**